**George CRAVE, Crave Brothers and Weichert, Katzman Farms, Inc., John Rosenow, Rosenholm Farms, Jeffery C. Opitz, Opitz Brothers, Dennis Neumann, Carl Joseph Pagel, Fetzer Farms, Inc., Jon–De Farm, Inc., O'Harrow's, Inc., and Robert R. Spitzer, Plaintiffs,**

v.

**Alan T. TRACY, Secretary of Wisconsin Department of Agriculture, Trade, and Consumer Protection, Defendant.**

No. 96–C–0321.

United States District Court, E.D. Wisconsin.

Oct. 7, 1996.

Michael R. Docherty, Doherty, Rumble & Butler, St. Paul, MN, Kevin E. Martens, Foley & Lardner, Milwaukee, WI, for Plaintiff.

Bruce A. Craig, Susan K. Ullman, Assistant Attorney Generals, Wisconsin Department of Justice, Office of the Attorney General, Madison, WI, for Defendant.

### MEMORANDUM AND ORDER RE: PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

GORENCE, United States Magistrate Judge.

The plaintiffs, who are farmers and dairy farms in Wisconsin that produce raw milk for sale to dairy plants, commenced this action on March 19, 1996, against defendant Alan T. Tracy, Secretary of the Wisconsin Department of Agriculture, Trade, and Consumer Protection (DATCP). The plaintiffs are challenging the constitutionality of Wis.Stat. §§ 100.20 and 100.22, anti-price discrimination statutes, and an Emergency Order effective January 1, 1996, which amended Wis.Admin.Code Ch. ATCP 100 (note) and created ATCP 100.76(3m) and subchapter VI of chapter ATCP 100, relating to price discrimination. (See Exh. 19 admitted at preliminary injunction hearing).

The plaintiffs seek to prevent the defendant from interpreting and enforcing the statutes and the Emergency Order to restrict the payment of milk volume premiums in the State of Wisconsin. Volume premiums are payments made by milk processors

(dairy plant operators) to producers (dairy farms) for milk in excess of the base price. These volume premiums, which are determined by the processors, are paid in increasing amounts for increasing volumes of milk purchased.

The plaintiffs seek a declaratory judgment pursuant to 28 U.S.C. § 2201, that the challenged statutes and order are unconstitutional. They also seek preliminary and permanent injunctive relief restraining the defendant and his agents from the use, operation, enforcement, execution, and application of Wis.Stat. § 100.22[1] and Wis.Stat. § 100.20[2] and any orders promulgated thereunder to prohibit or restrict payment of volume premiums. The plaintiffs also seek to recover their costs, disbursements, expert witness fees, and attorney's fees and expenses pursuant to 42 U.S.C. § 1983 and § 1988.

This action was assigned to this court according to the random assignment of civil cases pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule 13.03 (E.D.Wis.). The parties have consented to United States magistrate judge jurisdiction. Therefore, this court has jurisdiction over the action pursuant to 28 U.S.C. § 636(c) and Local Rule 13.05(a) (E.D.Wis.). Jurisdiction in this case is based on 28 U.S.C. § 1331 and 28 U.S.C. § 1367. The parties agree that venue is appropriate in this district pursuant to 28 U.S.C. § 1391.

A hearing on the plaintiffs' motion for preliminary injunction was conducted on May 14, 15, and 16, 1996. The parties subsequently submitted post-hearing briefs. In light of subsequent developments, particularly this court's review of the June 17, 1996, final draft rule, which modified the Emergency Order "in response to hearing testimony" and in light of enforcement experience under the "emergency rule"[3], at the court's request, the parties submitted supplemental briefs to address the impact of the expiration of the January 1, 1996, Emergency Order on this case. The parties also addressed whether the plaintiffs' challenges to the various versions of the January 1, 1996, Emergency Order are moot and, therefore, no longer present a justiciable case or controversy. The parties also addressed the implications,

---

1. Wis.Stat. § 100.22 provides in pertinent part:

    (1) PROHIBITION. Except as provided in sub. (1m), no person engaged in the business of buying milk from producers for the purpose of manufacture, processing or resale may discriminate between producers in the price paid for milk or in services furnished in connection with the purchase of milk if the discrimination injures producers or injures, destroys or prevents competition between competing purchasers of milk.

    (1m) MILK PRICING. A person engaged in the business of buying milk from producers for the purpose of manufacture, processing or resale may pay producers different prices for the purchase of milk based on differences in milk quality, if all of the following apply:

    (a) Before making any payments to producers, the person engaged in the business of buying milk from producers establishes a payment method based on differences in milk quality determined by an actual measured difference in bacteria count, somatic cell count, enzyme level or drug residue findings in the milk.

    (b) Before making any payments to producers, the person engaged in the business of buying milk from producers announces, and offers to make payments in accordance with, the payment method established under par. (a) to all producers from whom the person buys milk.

    (c) The person engaged in the business of buying milk from producers makes payments to all milk producers from whom the person purchases milk in accordance with the payment method established under par. (a).

    (d) The payment method established under par. (a) is not part of any other method used to discriminate between producers in the price paid for milk or in services furnished in connection with the purchase of milk.

    \* \* \* \* \* \*

    (3) JUSTIFICATION DEFENSE. It is a defense to a prosecution for violation of this section or a special order issued under this section to prove that the discrimination in price or services was done in good faith to meet competition or was commensurate with an actual difference in the quantity of or transportation charges or marketing expenses for the milk purchased.

2. Wisconsin Stat. § 100.20(1) states:

    Methods of competition in business and trade practices in business shall be fair. Unfair methods of competition in business and unfair trade practices in business are hereby prohibited.

    The statute then describes unfair trade methods of competition and unfair trade practices, and sets forth an enforcement mechanism. See Wis. Stat. § 100.20.

3. See Memorandum of June 4, 1996, at 5.

if any, presented in this action by the final draft rule of June 17, 1996. The plaintiffs' final brief was filed on September 30, 1996, pursuant to the court's order. Having considered the evidence, the applicable law and the arguments of the parties, the court now sets forth its findings of fact and conclusions of law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure.

### Findings of Fact

Plaintiff George Crave is the owner and operator of plaintiff Crave Brothers and Weichert (Crave Brothers) dairy farm, a Wisconsin general partnership in Waterloo, Wisconsin. (Plaintiffs' Exh. 28, ¶ 2). The farm has been in its current location for 15 years. Plaintiff Crave Brothers has a herd size of 530 cows, with an annual milk production of 12,000,000 pounds. Plaintiff Crave Brothers is a member of Alto Cooperative (Alto) and has received volume premiums since approximately 1987 from Alto. The farm was to receive $.65/cwt in 1996 from Alto[4]. Effective January 1, 1996, in an attempt to comply with the Wisconsin's "restriction" of volume milk premiums, Alto issued a revised volume premium schedule. (Plaintiffs' Exh. 28, ¶ 6 & Exh. A attached thereto). As a result, plaintiff Crave Brothers will only receive a volume premium of $.48/cwt from Alto.

Plaintiff George Crave estimates that if volume milk premiums are restricted to $.483/cwt in 1996, the farm will lose $20,040.00 in gross annual income. (Plaintiffs' Exh. 28, ¶ 7). He avers that if volume premiums are restricted to $.30/cwt, the farm will lose $42,000.00 in gross annual income in 1996. (Plaintiffs' Exh. 28, ¶ 7). He also avers that if volume premiums are limited to $.30/cwt or $.48/cwt, the loss of income would reduce plaintiff Crave Brothers' cash flow significantly, preventing it from staying current on loan repayment schedules for loans obtained for real estate, purchases of property, and buildings and improvements. (Plaintiffs' Exh. 28, ¶ 14). The financial stability of Crave Brothers would be put in serious jeopardy. (Id.). Plaintiff Crave also avers that if volume premiums are limited to $.30/cwt or

$.48/cwt, the farm will attempt to sell, or consider selling, its milk to out-of-state processors. (See Plaintiffs' Exh. 28, ¶¶ 8 & 12).

Plaintiff Katzman Farms, Inc. (Katzman Farms) is a dairy farm located in Whitewater, Wisconsin, which was established in 1983. (Plaintiffs' Exh. 32, ¶ 2). Plaintiff Katzman Farms has a herd size of 500 head, with an annual milk production of approximately 10,950,000 pounds. In 1993, plaintiff Katzman Farms began receiving volume premiums from Dean Foods in Chemung, Illinois. Between August 1, 1995, and February 29, 1996, the farm sold its milk to Grande Cheese in Brownsville, Wisconsin and was paid volume premiums of $.90/cwt. As of March 1, 1996, the farm resumed selling its milk to Dean Foods which offered to pay a $.90/cwt volume premium.

Thomas Katzman, president of plaintiff Katzman Farms, avers that if volume premiums above $.30/cwt are prohibited, the farm would lose approximately $65,700.00 in annual gross income in 1996. (Plaintiffs' Exh. 32, ¶ 8). If volume premiums above $.483/cwt are prohibited, the farm will lose in excess of approximately $45,661.50 in 1996. (Id.). He avers that if volume premiums are limited to $.30 to $.48/cwt, the financial stability of Katzman Farms will be put at serious risk. (Plaintiffs' Exh. 32, ¶ 9). He also avers that if Dean Foods is prohibited from paying volume premiums in excess of $.30 to $.48/cwt, the farm will attempt to sell its milk to other processors either within or outside of Wisconsin who are offering volume milk premiums in the $.90/cwt range. (Plaintiffs' Exh. 32, ¶ 10).

Plaintiff John Rosenow is a partner in plaintiff Rosenholm Farms, a dairy farm located in Waumandee, Wisconsin. (Plaintiffs' Exh. 31, ¶ 2). The farm was established in 1858 by plaintiff John Rosenow's great-great-grandparents. Plaintiff Rosenholm Farms has a current herd size of 300 milking cows, with a milk production of approximately 7,089,000 pounds in 1995. Plaintiff Rosenholm Farms has received volume premiums since 1988, primarily from Foremost Farms USA Cooperative (Foremost). As of Janu-

---

4. "Cwt" is the cost per hundred weight.

ary 1, 1996, the farm received volume premiums of approximately $.61/cwt from Foremost. The volume premiums received by the farm constitute approximately 30% of its net profit.

Plaintiff Rosenow avers that if volume premiums above $.30/cwt are discontinued, the farm would lose approximately $21,000.00 in annual gross income in 1996. (Plaintiffs' Exh. 31, ¶ 8). If volume premiums above $.483/cwt were discontinued, the farm will lose in excess of approximately $9,100.00 in 1996. (*Id.*). He avers that such reductions in volume premiums would place the financial stability of the farm at serious risk. (*Id.*). He further avers that, if those reductions in volume premiums were to occur, he would be forced to reduce his personal income to the extent that he and his wife might be forced to default on loans they have obtained from his mother. (*Id.*). His mother uses the payments on the loans to pay for the nursing home care of plaintiff John Rosenow's father. (*Id.*).

Plaintiff Jeffery C. Opitz is the owner and operator of plaintiff Opitz Brothers Farm (Opitz Brothers), which has been located in Saukville, Wisconsin for 94 years. (Plaintiffs' Exh. 29, ¶ 2). Plaintiff Opitz Brothers has a herd size of 625 cows with an annual milk production of 12,500,000 pounds. The farm began receiving volume premiums in 1985. In 1995, the farm received volume premiums from Mid–Am Dairy of approximately $.75/cwt. In 1996, the farm will receive a volume premium of $.65/cwt from Alto. Volume premiums represent an estimated $81,250.00 gross annual income to plaintiff Opitz Brothers.

Plaintiff Opitz avers that if volume premiums above $.30/cwt are prohibited, the farm's net income will be reduced by at least 25%. (Plaintiffs' Exh. 29, ¶ 7). If volume premiums above $.483/cwt are prohibited, the farm's net income will be reduced by at 12%. (*Id.*). If volume premiums are limited to the $.30 to $.483, the cash flow projections of the farm will be altered. He avers that the farm will not be able to conduct the capital replacement and/or improvements which are necessary to keep it competitive and will not be able to purchase the machinery it current-

ly needs, which will have "devastating effects" on the farm's financial stability and place the farm's financial stability at risk. (Plaintiffs' Exh. 29, ¶ 8).

Plaintiff Dennis Neumann owns a farm in Somerset, Wisconsin with a herd size of 150 cows and an annual milk production of between 5 and 6 million pounds. (Plaintiffs' Exh. 33, ¶¶ 2 & 3). The farm was established approximately 15 years ago. The Dennis Neumann Farm (Neumann Farm) has received volume premiums from Land O' Lakes which is located in Arden Hills, Minnesota since 1987. Neumann Farm received volume premiums from Land O' Lakes of approximately $.25/cwt as of January 1, 1996.

Neumann Farm has a marketing agreement with Land O' Lakes that extends until January 1, 2001. In his affidavit dated March 14, 1996, plaintiff Dennis Neumann avers that the Neumann Farm "just" has expanded to 300 cows and expects the farm's milk production to double by "the spring". (Plaintiffs' Exh. 33, ¶ 9). With the expansion, he expects that the farm's volume premiums will rise to approximately $.50–$.60/cwt. (*Id.*). The financing for the expansion of the farm was based on the assumptions that the farm would continue to receive volume premiums. (Plaintiffs' Exh. 33, ¶ 10).

Plaintiff Carl J. Pagel owns and operates a family farm, Ponderosa Blues Dairy, in Casco, Wisconsin. (Plaintiffs' Exh. 35, ¶ 2). The farm was established in 1975. The farm has a herd size of 435 cows and has an estimated annual milk production of more than 9,342,800 pounds. The farm began receiving volume premiums in 1993 of approximately $.22/cwt. In 1995 the farm received volume premiums at an average rate of $.68/cwt. In 1996, the farm will receive volume premiums of approximately $.70/cwt. The farm's current annual gross income from volume premiums is approximately $65,400.00.

Plaintiff Pagel avers that his farm currently has contracts with processors which include the payment of volume premiums. (Plaintiffs' Exh. 35, ¶ 5). He avers that if volume premiums above $.30/cwt are prohibited, the farm would lose in excess of approx-

imately $37,000.00 in annual gross income. (Plaintiffs' Exh. 35, ¶ 7). If volume premiums above $.483/cwt are prohibited, the farm will lose in excess of approximately $20,000.00. (*Id.*). Plaintiff Pagel avers that either reduction in gross annual income would seriously jeopardize the farm's ability to pay for capital purchases, repay principal, depreciation, and other expenses, which will put the future of the farm "at serious risk." (*Id.*).

Plaintiff Fetzer Farms, Inc. is a dairy farm in El Paso, Wisconsin. (Plaintiffs' Exh. 34, ¶ 2). The farm, established approximately 70 years ago, has a current herd size of 225 head and an annual milk production of approximately $3,200,000 pounds. Fetzer Farms has received volume premiums since 1992. As of January 1, 1996, Fetzer Farms received volume premiums in the amount of $.232/cwt from Land O' Lakes in Arden Hills, Minnesota. Fetzer Farms has a marketing agreement with Land O' Lakes effective until August 1, 2000. Under this agreement, Fetzer Farms has an obligation to sell all of its milk (except what is necessary for home and farm) to Land O' Lakes.

Robert W. Fetzer, a principal shareholder and manager the farm, avers in an affidavit dated March 9, 1996, that the farm is expanding its operation and expects to obtain increased levels of production in the fall which would qualify it for volume premiums in the range of in excess of $.30/cwt. (Plaintiffs' Exh. 34, ¶ 9). He also avers that it is his understanding that AMPI, to whom the farm sold its milk for over 15 years, is offering volume premiums in excess of $.45/cwt for the farm's current level of milk production, and that AMPI is one of the processors to whom the farm will consider selling milk in the fall. (Plaintiffs' Exh. 34, ¶ 11).

Plaintiff Jon–De Farm, Inc. (Jon–De Farm) is an 835 cow dairy farm in Rush River, Wisconsin with annual milk production of approximately 14,200,000 pounds. (Plaintiffs' Exh. 38, ¶¶ 2–4). The farm was established in 1914. Plaintiff Jon–De Farm has received volume premiums since 1992. As of January 1, 1996, the farm received volume premiums of approximately $.65/cwt of milk

constituting an annual gross income of approximately $102,700.00.

Dean G. Doornink, co-owner and general manager of the farm, avers that plaintiff Jon–De Farm built a 700 cow dairy farm in 1995 and based its cash flow projections for financing the dairy farm on the assumption that it would continue to receive volume premiums. (Plaintiffs' Exh. 38, ¶ 8). He avers that a limitation of volume premiums to $.30/cwt would result in lost income to the farm of approximately $55,300.00 in 1996. (Plaintiffs' Exh. 38, ¶ 12). If volume premiums are limited to $.483/cwt, the farm will lose gross income of approximately $26,386.00 in 1996. (*Id.*). Doornink avers that either proposed action would seriously jeopardize plaintiff Jon–De Farm's ability to meet its financial obligations, would increase the term necessary for the plaintiff to complete loan repayment by as much as 50% and would place the farm's financial stability at serious risk. (Plaintiffs' Exh. 38, ¶¶ 13 & 14).

Plaintiff O'Harrow's, Inc. (O'Harrow's) is a dairy farm located in Oconto Falls, Wisconsin, with a herd size of 610 cows and an annual milk production of 12,000,000 pounds. (Plaintiffs' Exh. 30, ¶¶ 2 & 3). The farm was established in 1947. Plaintiff O'Harrow's began receiving volume premiums in 1989 and as of January 1, 1996, received volume premiums of approximately $.68/cwt. Timothy O'Harrow, the owner and operator of the farm, avers that if volume milk premiums are restricted to $.30/cwt, the farm will lose gross income of approximately $45,600.00 in 1996. (Plaintiffs' Exh. 30, ¶ 6). If volume premiums are restricted to $.483/cwt, the farm will lose gross income of approximately $24,000.00 in 1996. (*Id.*) Plaintiff O'Harrow's, Inc. has been substantially leveraged during the preceding two years due to expansion of the dairy. (Plaintiffs' Exh. 30, ¶ 7). The farm's cash flow will be seriously weakened and its liquidity will be seriously damaged if it is no longer allowed to accept volume premiums above $.30/cwt or $.483/cwt. (Plaintiffs' Exh. 30, ¶ 7).

Plaintiff Robert R. Spitzer owns Spitzer Farms, a dairy farm in Mifflin, Wisconsin, which he established in 1984. (Plaintiffs' Exh. 36, ¶ 2). Spitzer Farms has 400 milking

cows with a annual milk production of approximately 10,200,000 pounds. The farm began receiving volume premiums in 1984 and since November 1, 1995, has received volume premiums from Dean Foods in Chemung, Illinois in the amount of $.90/cwt.

Plaintiff Spitzer avers that if volume premiums are limited to $.30/cwt, the farm will lose approximately $61,200.00 of gross income in 1996. (Plaintiffs' Exh. 36, ¶ 8). If the state prohibits processors from paying volume milk premiums in excess of $.483/cwt, the farm will lose approximately $42,400.00 of gross income in 1996. (*Id.*). Plaintiff Spitzer avers that if the state takes such action and limits the volume milk premiums that Dean Foods can pay, the farm will attempt to sell its milk to other processors either within or outside the state who are offering volume milk premiums in the $.90/cwt range. (Plaintiffs' Exh. 36 ¶ 9). He further avers that if the state takes such action and "if other financial factors affecting our farm are not ideal", the state's action would damage the farm's financial stability and put the jobs of some of the farm's employees at risk. (Plaintiffs' Exh. 36 ¶ 10).

Defendant Alan T. Tracy is the Secretary of the Wisconsin Department of Agriculture, Trade, and Consumer Protection (DATCP).

The plaintiffs seek to prevent the defendant from interpreting and enforcing Wis. Stat. § 100.22 to restrict the payment of milk volume premiums in the State of Wisconsin. The plaintiffs are challenging the constitutionality of Wis.Stat. § 100.22 and an emergency rule promulgated thereunder, Wis.Admin.Code Ch. ATCP 100.

Wis.Stat. § 100.22 was enacted by the state legislature in 1911. Wis.Stat. § 100.22, an anti-price discrimination statute, prohibits purchasers (processors) of milk from discriminating between producers in the price paid for their milk if the discrimination injures producers or injures, destroys, or prevents competition between competing purchasers of milk. However, the price discrimination can be justified if the differences are the result of "meeting competition" or if they reflect differences in the cost of acquiring the milk (cost justified).

Plaintiff John Rosenow avers that sometime during the time period of December 21, 1995, he had a telephone conversation with Donald J. Furniss, Chief of the DATCP Dairy and Food Section. (Plaintiffs' Exh. 31, ¶ 11). Furniss "conveyed" to him that the state, through DATCP, would be prohibiting volume premiums in excess of $.30/cwt. (*Id.*)

Effective January 1, 1996, the DATCP promulgated an Emergency Order setting forth elements of justification which would avoid violation of Wis.Stat. § 100.22. The Emergency Order was designed to address increasing complaints from producers and dairy plant operators about the use of volume premiums, which resulted in a statewide study of volume premiums by DATCP (Plaintiffs' Exh. 24 at 3). DATCP had also required dairy plant operators to submit cost justification for their volume premium programs based on competitor complaints. (*Id.*) The department also initiated enforcement actions against two dairy plant operators in 1989 which resulted in administrative consent orders. (*Id.*) The Emergency Order was proposed by the DATCP to secure "industry-wide compliance with s. 100.22." The timing of the Emergency Order was designed to enable dairy plant operators to modify their computer software at the same time as the January 1, 1996, effective date of new federal milk marketing orders.

Plaintiff Rosenow avers that on or about January 18, 1996, he had a meeting with defendant Alan T. Tracy and Furniss. (Plaintiffs' Exh. 31, ¶ 13). He avers that these DATCP officials represented that the state and DATCP would be enforcing the Emergency Order by prohibiting any volume premiums in excess of $.483/cwt. (*Id.*). They also made it clear to him that DATCP intended to enforce Wis.Stat. §§ 100.20 and/or 100.22 against dairy processors outside the state of Wisconsin who were purchasing milk from Wisconsin dairy farmers. (*Id.*). The fact that DATCP will enforce the statutes against out-of-state dairy processors was reiterated by Furniss at a public hearing held by DATCP on February 1, 1996. (Plaintiffs' Exh. 31, ¶ 14).

After the preliminary injunction hearing, by letter dated June 25, 1996, the defendant

submitted various documents from the DATCP to the court, with a copy to the plaintiffs' counsel. These documents include a June 4, 1996, memorandum from the defendant to the Board of Agriculture, Trade and Consumer Protection (DATCP Board) and a memorandum dated June 17, 1996, from Jim Matson of the DATCP to Assistant Attorney General Bruce A. Craig.

In the June 4, 1996, memorandum, the defendant explains that the emergency rule expired on May 29, 1996, and was not extended.[5] (*Id.* at 4). Apparently, a proposed final draft rule dated May 28, 1996, was submitted to the DATCP Board for approval. The June 4, 1996, memorandum references the instant action, and states that the court had conducted a preliminary injunction hearing. It also states that public hearings had been held on the January 1, 1996, Emergency Order and that the DATCP modified the final draft rule "in response to hearing testimony and in light of enforcement experience under the 'emergency' rule." (*Id.*) at 4–5.

The June 4, 1996, memorandum sets forth five major areas which are clarified in the May 28, 1996, draft. The final draft clarifies: 1) "the cost accounting standards used to determine whether price discrimination between producers or pay classes is based on a true difference in procurement costs", 2) "the treatment of discriminatory payments or services (e.g. free hauling services to some producers) which are not reflected in the milk price", 3) "that neither the price discrimination law nor the DATCP's rule prohibits a dairy plant operator" from paying a different price for Grade A versus Grade B milk, complying with a federal milk marketing order, properly charging a producer for costs which the dairy plant operator incurs because of the producer's violation of ch. ATCP 60, Wis.Adm.Code (dairy farms), or paying

different milk prices to producers based on actual differences in the quality of the their milk or differences in percentage content of milk components, 4) that the exemption for milk quality and milk component premiums are subject to six specified conditions, and 5) "the standards which a dairy plant operator must meet in order to claim a defense of 'meeting the competition.'" (*Id.*) at 5–7.

The June 17, 1996, memorandum explains that a modification to the May 28, 1996, draft rule was made and a final draft rule dated June 17, 1996, (Final Rule) was created. The June 17, 1996, memorandum also explains that, if the DATCP Board approves the final draft rule, the DATCP will transmit it for legislative committee review. It further states: "[i]f the legislative committee takes no action to stop the rule, the rule will likely take effect sometime this fall (October 1 at the earliest)." (*Id.*)

In the June 25, 1996, letter to the court, counsel for the defendant states that the DATCP will not attempt to reapply for the Emergency Order and has passed its final draft, which will soon be submitted to the legislature. In "the interim, the final draft rule represents the DATCP's current interpretation of Wis.Stat. § 100.22." (*Id.*)

Like the earlier Emergency Order, the June 17, 1996, Final Rule (Final Rule) contains definitions in § ATCP 100.98, prohibits price discrimination in § ATCP 100.91, sets forth the procedure for demanding justification in § ATCP 100.985 [6], addresses failure to justify discrimination and notice in § ATCP 100.96 [7], and defines injury to producer in § ATCP 100.987 [8]. However, the Final Rule definition section has expanded from defining four terms to defining nine terms. *See* § ATCP 100.98. The section on price discrimination, § ATCP 100.981 now includes a provision specifically stating: "[a]

---

5. The Emergency Order effective January 1, 1996, is referred to in this memorandum as "Emergency Order."

6. This section is a revision of Emergency Order ATCP § 100.983 which was entitled "Demanding Justification for Discriminatory Prices."

7. This material reflects revision from Emergency Order ATCP § 100.984 which was entitled "Failure to Justify Discrimination."

8. This material was set forth in Emergency Order ATCP § 100.985 entitled "Injury to Producer", but does not include the note which was formerly a part of that section.

dairy plant operator [9] does not discriminate under this subsection if the operator offers the same non-price consideration to all producers [10] on equal terms so that the same non-price consideration is effectively available to all producers who wish to receive it." The Final Rule adds a new section, § ATCP 100.982, entitled, "Exemptions", that sets forth four circumstances to which the price discrimination prohibition does not apply.

The Final Rule also contains a provision in § ATCP 100.983 entitled, "Cost–Justification Defense", which expressly provides that: "it is a defense for the operator to prove, based on documentary evidence which the operator possessed and relied upon at the time of the alleged discrimination, that the amount of price discrimination per hundredweight between those pay classes or individual producers did not exceed, in any relevant pay period, the difference in the operator's relevant procurement cost per hundredweight between those pay classes or producers." Section ATCP 100.983 also sets forth specific "relevant procurement costs per hundredweight" to justify both discrimination resulting from the payment of volume premiums based on total milk volume, and discrimination resulting from the payment of volume premiums based on volume per pickup. *See* Final Order § ATCP 100.983(2) and § ATCP 100.983(3).

Section ATCP 100.983(4) sets forth the procedure for calculating a dairy plant operator's "producer's service costs per hundredweight" and § ATCP 100.983(5) sets forth the method for calculating a dairy plant operator's "pickup costs per hundredweight." Sections (6) and (7) of § ATCP 100.983 address, respectively, cost accounting and the value of non-price consideration per hundredweight. To some extent, the information set forth in Final Order § ATCP 100.983 was included in Emergency Order § ATCP 100.986 which was entitled, "Calculating Procurement Costs per Hundredweight." However, Final Rule § ATCP 100.983 is more detailed and has a different focus and emphasis.

Final Rule § ATCP 100.984 also contains a new section entitled, "Meeting Competition Defense", which specifically provides that it is a defense for an operator to prove that the operator discriminated between producers or pay classes "in good faith in order to meet the competition." The proof required to establish such a defense and limitations on the defense are set forth in Final Order §§ ATCP 100.984(2) & 100.984(3).

The DATCP analysis of the Final Rule includes a background section which states that Wisconsin's 27,000 dairy farmers sell nearly three billion dollars worth of milk annually to dairy plant operators and that milk sales represent the primary or exclusive source of income for thousands of Wisconsin farm families. It further states that:

> [m]any operators appear to be paying higher prices to some producers which cannot be justified on the basis of milk quality or differences in procurement cost. Discrimination in milk prices may injure other milk producers and competing dairy plant operators, and may contribute to unwarranted concentration in the dairy industry.

Final Rule at 2.

Counsel for the plaintiffs advised the court by letter of June 27, 1996, that neither the June 25, 1996, letter from defendant's counsel nor the enclosures, which included the Final Rule, change the scope of relief sought by the plaintiffs. In a September 19, 1996, letter from defendant's counsel to the court,

---

**9.** Dairy plant operator is defined in Wis.Admin.Code § ATCP 100.01(9) as meaning either of the following:

(a) A person who holds, or is required to hold, a dairy plant license under s. 97.20, Stats., and who buys milk from producers.

(b) A person who operates a dairy plant outside this state, and who buys milk from Wisconsin producers for delivery to that out-of-state dairy plant.

**10.** Producer is defined in Wis.Admin.Code § ATCP 100.01(19) as meaning either of the following:

(a) A person who owns or operates a dairy farm in this state and sells or distributes milk produced on that farm.

(b) A person who owns or operates a dairy farm in another state and sells or distributes milk produced on that farm to a dairy plant located in this state.

(c) A producer agent.

he states: "please be advised that the June 17; 1996, final rule has been approved by the Legislature and will become effective on October 1, 1996." [11]

Two economists testified at the preliminary injunction hearing and provided an overview of the dairy industry in Wisconsin and the United States. The Wisconsin dairy industry is in a state of decline. From 1965 to 1994 Wisconsin went from 86,000 to 29,000 dairy farms, a decline of approximately 66%. (Plaintiffs' Exh. 7 & 8, Tabs 4 & 5). For approximately the last fifteen years, Wisconsin has been losing approximately 1,000 dairy farms per year. (Plaintiffs' Exh. 6, Tab 3). The number of Wisconsin dairy plants has also been declining since 1985. (Plaintiffs' Exh. 17, Tab 17). In 1985, there were approximately 400 Wisconsin dairy plants and by 1994 that number was reduced to 241. (Plaintiffs' Exh. 17, Tab 17).

The plaintiffs' economic expert, Dr. Donald Ault, provided an explanation for this exodus from the industry. He stated that Wisconsin is not good at adopting new technology and is slow at making adjustments compared to other parts of the country. He testified that Wisconsin has lost its market share in the milk industry over the past ten years. Dr. Ault testified that 1,000 to 1,500 Wisconsin dairy farms go out of business every year. Smaller, more marginal operations are the ones that are leaving the industry. Dr. Ault defines a 50 cow dairy farm as a smaller operation. The national production of milk increased between 1950 to 1995, but milk production in Wisconsin has declined in six of the past ten years. Wisconsin milk production has been declining downward generally since 1988.

Wisconsin is losing its market share to dairy states in the south and west. Dr. Ault attributed this change in market share to modernization of the dairy industry in the south and west. These new dairy operations in the south and west are larger than the average Midwest operations. Larger operations in California, New Mexico, Texas, and Arizona have from 200 to 400 cow herds. In Idaho and Washington, average dairy herds are 250 cows. In Wisconsin, the average herd size is 51 cows.

In 1994, the top six milk cow populations and dairy producing counties in the nation were in California. (Plaintiffs' Exh. 11, Tab 8). The highest ranked Wisconsin county was Marathon County which was ranked 14th in milk cow population in the nation. Four other Wisconsin counties ranked within the top 20 milk cow populations in the country. Clark County ranked 16th, Grant, Dodge, and Dane Counties ranked 18th, 19th and 20th in milk cow populations respectively. (*Id.*)

Dr. Ault testified regarding economies of scale in the dairy industry. Economies of scale mean that as one increases the size of a business or operation, one lowers the cost of that operation. The national trend in farm size is towards increasingly larger farms. The Wisconsin trend is consistent with the national trend. Larger farms are better able to achieve cost savings through economies of scale. Larger farms are created by either expanding smaller existing facilities or establishing new facilities, utilizing new dairy technology.

Economies of scale also apply to milk processors. Milk processors can benefit from the economies of scale by utilizing as much as their processing plant capacity as possible. When a processor operates at a full or near full capacity, the cost of producing cheese on a per unit basis is reduced. Declining milk volumes produced by Wisconsin dairy farms, coupled with processors' demands for higher volumes of milk in order to operate at full or near full capacity, have resulted in increased competition among dairy plant processors for Wisconsin's milk supply.

The use of volume premiums by Wisconsin processors has increased over the last several years due to competition between processors for the larger producers. Volume premiums, which are determined by the processors, are generally not part of the contract terms and are not set for a specific period of time. Processors establish schedules of premiums which typically provide the

---

**11.** The Final Rule is codified in Subchapter VI, entitled "Discriminatory Payments to Produc-

ers", as part of Wis.Admin.Code Chapter ATCP 100.

amount of the volume premium and the quantity of milk at which the farmer will qualify for the volume premium price. Both Grade A and Grade B producers qualify for volume premiums. Grade A milk is the grade of milk primarily used for liquid milk. It is typically sold by larger producers. Grade B milk is manufacturing grade milk used to make other products and is typically produced by smaller producers.

Processors pay volume premiums for a number of reasons. They want to expand output from dairy operations so that they can run their processing plant efficiently and lower their cost. They also use volume premiums as an incentive to get more milk and to attract milk from all sources.

Dr. Ault explained his understanding of the economic rationale for payment of volume premiums to larger producers. Larger producers are expanding their operations as opposed to smaller producers. The larger operations are perceived as the type of operations that will be economically viable in the future and milk processors find value in dealing with producers whom they expect will have a long term existence. Another underlying reason for payment of volume premiums is to enable processors to run their plants at maximum capacity and efficiency. Payments of such premiums are also made because competing milk processors are paying them. Competition among processors of milk is "very intense" and the processors view volume premiums as a means of acquiring more milk.

Dr. Ault also explained the federal milk price program, including the Basic Formula Price (BFP) which affects the price paid for milk throughout the nation.[12] The BFP is the price processors pay for Grade A milk throughout most of the country (except California, which is not subject to the federal marketing order). The BFP is based upon a survey of prices paid by 170 processors for Grade B milk in Wisconsin (100 processing plants) and Minnesota (70 processing plants) adjusted monthly by changes in product prices. Changes in the price of milk in Wisconsin and Minnesota influence prices under the federal milk marketing orders throughout the country. The BFP includes volume premiums.

In federal milk marketing orders, the Class I price is the BFP plus a fixed differential specified in the order. This class of milk is considered the fluid or packaged milk portion. If the BFP rises or falls, the milk price to Grade A producers and the price of packaged milk and cream products rise and fall accordingly. Prices for milk used in Class II, such as cottage cheese, yogurt, and ice cream, are also related to the BFP either by means of a product price formula that updates this price or a small fixed differential.

Both parties' experts agreed that the enforcement of the Emergency Order would have an effect on the price of milk nationwide. Dr. Ault opined that the Emergency Order would result in a reduction of the BFP which would reduce the price of milk nationwide. The state's expert, Dr. Edward V. Jesse, testified that the Emergency Order would increase the price paid for milk across the country. In his opinion, the Emergency Order would raise the base price which is paid to both Grade A and Grade B producers. This, in turn, would raise the BFP, raising Grade A milk prices throughout the country. According to Dr. Jesse, the result would be that processors throughout the country would pay higher prices for Grade A milk.

---

12. The federal milk marketing order system is authorized under the Agricultural Marketing Agreement Act of 1937, as amended (AMAA), 7 U.S.C. § 601 *et seq.* The AMAA is implemented under federal regulations. The intent of the AMAA is, among other things, "to establish and maintain such orderly marketing conditions for agricultural commodities in interstate commerce as will establish, as the prices to farmers, parity prices." 7 U.S.C. § 602(1). Milk marketing orders function by establishing minimum prices to be paid to producers. 7 U.S.C. § 608c(18).

Milk marketing orders are designed to reflect the price of feeds, the available supplies of feeds, and other economic conditions which affect market supply and demand for milk or its products in the marketing area to which it relates, to insure a sufficient quantity of pure and wholesome milk to meet current needs, and to assure a level of farm income adequate to maintain productive capacity sufficient to meet anticipated future needs, and to be in the public interest. *See* 7 U.S.C. § 608c(18).

Dr. Jesse also testified about the cost justification formula or the "meeting competition" defense in the Emergency Order. He testified that, if volume premiums were justified under either the cost justification formula or the "meeting competition" defense, they theoretically could be justified to an unlimited amount. Specifically, he testified that a $.90/cwt volume premium similar to the volume premium paid to two plaintiffs by Dean Foods, could be justified under the state's formula. (*See* Defendant's Exh. 5 and 6).

By an affidavit submitted September 30, 1996, Dr. Ault avers that he has compared the Final Rule to the Emergency Order which he initially reviewed in performing his economic analysis of the Emergency Order's effect. (Ault Aff. ¶ 3). It is his professional opinion that the economic effect of the Final Order will be substantially similar, and in fact nearly identical, to the economic effect of the Emergency Order (*Id.*)

In his affidavit, he opines that the effect of the Final Rule will be to restrict volume premiums which cannot be cost justified under the state's formula, or which do not meet the state's "meeting competition" defense. (Ault Aff. ¶ 5). He avers that while the Final Rule sets forth somewhat more detailed standards with respect to the cost justification analysis, the standards are not substantively different. (*Id.*) He further avers that the economic effect on milk processors and producers, including the plaintiffs, will be virtually identical. (*Id.*) His analysis of the broader economic effects, including the effect on the BFP, also remains the same under the Final Rule. (*Id.*)

### Analysis

This case presents issues regarding the standing of the plaintiff producers to bring this action, and the mootness of their challenge in light of the expiration of the Emergency Order. Both issues relate to the "case or controversy" requirement of Article III of the United States Constitution.

The doctrine of standing is "an essential and unchanging part of the case-or-controversy requirement of Article III." *Northeastern Fla. Contractors v. Jacksonville*, 508 U.S. 656, 663, 113 S.Ct. 2297, 2301–2302, 124 L.Ed.2d 586 (1993) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 112 S.Ct. 2130, 119 L.Ed.2d 351 [1992]). The court of appeals for this circuit has observed that:

The first element of the standing inquiry that a plaintiff 'must satisfy in this Court is the "case" or "controversy" requirement of Art. III of the United States Constitution.' *Secretary of State of Maryland v. J.H. Munson Co.*, 467 U.S. 947, 955, 104 S.Ct. 2839, 2846, 81 L.Ed.2d 786 ... (1984). The relevant inquiry for a case or controversy is to determine whether a plaintiff has shown an injury to himself that is likely to be redressed by a favorable decision. *Simon v. Eastern Kentucky Welfare Rights Organization*, 426 U.S. 26, 38 (96 S.Ct. 1917, 1924, 48 L.Ed.2d 450) ... (1976).

*South–Suburban Housing Center v. Board of Realtors*, 935 F.2d 868, 878 (7th Cir.1991), *cert. denied*, 502 U.S. 1074, 112 S.Ct. 971, 117 L.Ed.2d 136 (1992); *Penny Saver Publications, Inc., v. Village of Hazel Crest*, 905 F.2d 150, 154 (7th Cir.1990). The mere voluntary cessation of allegedly illegal conduct does not moot a case. *United States v. W.T. Grant Co.*, 345 U.S. 629, 632, 73 S.Ct. 894, 897, 97 L.Ed. 1303 (1953). However, a case does cease to be a live controversy if the recurrence of the challenged conduct is only a speculative contingency. *Hall v. Beals*, 396 U.S. 45, 49, 90 S.Ct. 200, 202, 24 L.Ed.2d 214 (1969). *See also, Super Tire Engineering Co., v. McCorkle*, 416 U.S. 115, 122, 94 S.Ct. 1694, 1698, 40 L.Ed.2d 1 (1974). "A court may grant declaratory relief even though it chooses not to issue an injunction" because that claim is moot. *Powell v. McCormack*, 395 U.S. 486, 499, 89 S.Ct. 1944, 1952, 23 L.Ed.2d 491 (1969).

To establish standing a party must demonstrate three things: (1) "injury in fact," which means an invasion of a legally protected interest that is "(a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical," (2) a causal relationship between the injury and the challenged conduct, and (3) a likelihood that the injury will be redressed by a favorable decision. *Northeastern Fla. Contractors*, 508

U.S. at 663–64, 113 S.Ct. at 2301–02. (citations omitted).

"It is a long-settled principle that standing cannot be 'inferred argumentatively from averments in the pleadings, but rather must affirmatively appear in the record.'" *FW/PBS, Inc. v. Dallas,* 493 U.S. 215, 231, 110 S.Ct. 596, 607–08, 107 L.Ed.2d 603 (1990) (citations omitted). The party who seeks the exercise of jurisdiction in his favor has the burden of clearly alleging facts "demonstrating that he is a proper party to invoke judicial resolution of the dispute." (*Id.*) (quoting *Warth v. Seldin,* 422 U.S. 490, 518, 95 S.Ct. 2197, 2215, 45 L.Ed.2d 343 [1975]).

The plaintiffs argue that the expiration of the Emergency Order has no impact on this case, because their request for relief encompasses not only the Emergency Order but any action taken by Wisconsin to restrict volume premiums. They also contend that even if the defendant announced that he no longer intended to restrict the payment of volume premiums, the case would still not be moot because the defendant's challenged action is capable of repetition if it evades review.

The defendant argues that the plaintiffs' complaint does not include a challenge to the statute itself, and that the only two rules mentioned in the plaintiffs' complaint are the Emergency Order, and a proposed final order, neither of which now exists. Therefore, the defendant argues that there is no longer any case or controversy. The defendant further contends that the new Final Rule is substantially different from the Emergency Order.

The defendant argues that the plaintiffs lack standing because, among other arguments, § 100.22 is enforceable against processors not producers of milk. He further argues that the plaintiffs have failed to show any economic injury and that any injury to them is purely speculative. The plaintiffs contend that they will suffer an imminent and concrete injury if the payment of volume premiums is restricted since they will lose money and be prohibited from freely competing in the interstate market for milk.

An "economic injury, though indirect, is sufficient to confer standing." *Government Suppliers Consolidating Serv. v. Bayh,* 975 F.2d 1267, 1274 (7th Cir.1992), *cert. denied,* 506 U.S. 1053, 113 S.Ct. 977, 122 L.Ed.2d 131 (1993). In *Government Suppliers,* the court held that the plaintiffs, whose businesses consisted of arranging for others to do "backhauling" (trucking of municipal waste), had standing to bring a declaratory judgment action challenging an Indiana statute banning backhauling. (*Id.*) Although the plaintiffs did not themselves engage in backhauling, the fact that their business would "suffer severe adverse effects" from the enforcement of the backhauling ban gave them standing.

■ The plaintiffs are dairy farmers who receive volume premiums from milk processors. The state's implementation of an enforcement program may adversely impact upon the plaintiffs' receipt of those volume premiums. Accordingly, the plaintiffs have standing to bring this action.

■ Furthermore, the plaintiffs' challenge, while limited by expiration of the Emergency Order, is not moot. As described earlier, in many respects the Final Rule is substantially changed from the Emergency Order. However, both the Emergency Order and the Final Rule have their genesis in Wis.Stat. § 100.20 and § 100.22 and address payment of discriminatory volume premiums by milk processors. Both the Emergency Order and the Final Rule, for example, allow for payment of volume premiums when such premiums can be cost justified or justified as necessary to meet competition. To the extent that the Final Rule is compatible with the Emergency Order, the plaintiffs' contentions are viable. Furthermore, despite the defendant's assertion to the contrary, the plaintiffs' complaint and their submissions to the court clearly include a challenge to the statutory provisions themselves, Wis.Stat. §§ 100.20 and 100.22.

The defendant assets that if the court does not find the action moot, the plaintiffs' request for a preliminary injunction should be denied because the plaintiffs have little likelihood of success on the merits. The defendant further asserts that the granting of the injunction would favor the large farmers as

against "less large farmers" and, therefore, would disserve the public interest.

Under the case law of this circuit, a party is entitled to a preliminary injunction if it demonstrates that:

(1) It has no adequate remedy at law;

(2) It will suffer irreparable harm if the preliminary injunction is not issued;

(3) The irreparable harm it will suffer outweighs the irreparable harm the defendant will suffer if the injunction is granted;

(4) It has a reasonable likelihood of prevailing on the merits; and

(5) The injunction will not harm the public interest.

*See Storck USA, L.P. v. Farley Candy Co.,* 14 F.3d 311, 313–14 (7th Cir.1994); *Somerset House, Inc. v. Turnock,* 900 F.2d 1012, 1014–15 (7th Cir.1990); *West Allis Memorial Hosp., Inc. v. Bowen,* 852 F.2d 251, 253 (7th Cir.1988); *Roland Machinery Co. v. Dresser Industries, Inc.,* 749 F.2d 380, 386–88 (7th Cir.1984); *see also,* Fed.R.Civ.P. 65. The plaintiff's threshold burden is to establish the first and second factors and to show "some likelihood of success on the merits." *Ping v. National Educ. Ass'n,* 870 F.2d 1369, 1371 (7th Cir.1989) (emphasis in original); *see also, Roth v. Lutheran General Hosp.,* 57 F.3d 1446, 1453 (7th Cir.1995). Once the initial burden is met, the inquiry then becomes a sliding scale analysis of the harm to the parties and the public from the grant or denial of the injunction and the actual likelihood of success on the merits. *Ping,* 870 F.2d at 1371; *see also, Roth,* 57 F.3d at 1453.

"The purpose of a preliminary injunction is to minimize the hardship to the parties pending the ultimate resolution of the lawsuit." *Faheem–El v. Klincar,* 841 F.2d 712, 717 (7th Cir.1988). "The more likely the plaintiff is to win, the less heavily need the balance of harms weigh in his favor in order to get the injunction; the less likely he is to win, the more it need weigh in his favor." *Ping,* 870 F.2d at 1371–72 (citation omitted).

The plaintiffs assert that they have no adequate remedy at law and would suffer irreparable harm if the injunction did not issue. The plaintiffs must show that harm will result without injunctive relief and that the harm will not be compensable with money damages. The plaintiffs assert that damages are not available because the Eleventh Amendment to the United States Constitution would shield the defendant, who is sued in his official capacity, from an action to recover lost volume premiums or damages incurred as a result of enforcement of the statue and regulations. *See Will v. Michigan Dep't. of State Police,* 491 U.S. 58, 66, 109 S.Ct. 2304, 2309–10, 105 L.Ed.2d 45 (1989); *Edelman v. Jordan,* 415 U.S. 651, 663, 94 S.Ct. 1347, 1355–56, 39 L.Ed.2d 662 (1974).

■ Although the plaintiffs have shown they would not have an adequate remedy at law, they have failed to demonstrate that they will suffer irreparable harm if the preliminary injunction is not issued. *See Ping,* 870 F.2d at 1371. They have not demonstrated that any of the volume premiums that they receive or expect to receive can not be cost justified or that such premiums would not fall under the "meeting competition" defense. In fact, when the plaintiffs commenced this action, they believed that there was a maximum level volume premium of $.30/cwt or $.483/cwt that would satisfy the DATCP's regulatory scheme under Wis.Stat. §§ 100.20 and 100.22. Based on the hearing testimony, this belief, no matter how well founded at the inception of this lawsuit, is no longer valid. There is no magic number at which a volume premium will be automatically disallowed.

Dr. Jesse testified, for example, that the $.90 cwt volume premium paid by Dean Foods could be justified under the state's formula.[13] Moreover, under the new Final

---

**13.** The court notes that Dr. Jesse testified at his April 26, 1996, deposition that he did not believe the upper levels of volume premiums paid by Dean Foods could be cost justified. (Affidavit of Michael R. Docherty filed September 30, 1996, Exh. A at 93–94). He clarified this testimony at the hearing when he testified that the problem with the Dean Foods' volume premium was not the amount of the premium, but the differences between the various brackets in its volume premium schedule.

Rule, milk processors have detailed criteria by which they can now evaluate whether volume premiums will satisfy the Wisconsin milk anti-discrimination law. Thus, although the plaintiffs have shown that their income will be decreased if the volume premiums they now receive are curtailed, they have failed to show that the processors cannot meet the criteria for establishing that their volume premiums are cost justified or necessary to meet competition.

The court must also determine whether the plaintiffs have met their threshold burden of showing some likelihood of success on the merits. *See Ping,* 870 F.2d at 1371. The plaintiffs advance three arguments to support their challenges to the Wisconsin regulatory scheme. First, the plaintiffs claim a violation of the Commerce Clause of the United States Constitution. The Commerce Clause, which is contained in Article I, Section 8 of the United States Constitution provides that: "[t]he Congress shall have Power ... To regulate Commerce with Foreign Nations, and among the several States and with the Indian tribes ..." U.S. Const., Art. I, § 8.

Although the Commerce Clause is phrased as an affirmative grant of power to Congress, it is well established that the Commerce Clause also limits the power of states to adopt regulations that discriminate against interstate commerce. *See West Lynn Creamery, Inc. v. Healy,* 512 U.S. 186, 192–94, 114 S.Ct. 2205, 2211, 129 L.Ed.2d 157 (1994); *New Energy Co. of Indiana v. Limbach,* 486 U.S. 269, 273–74, 108 S.Ct. 1803, 1807–08, 100 L.Ed.2d 302 (1988). A cardinal principle under the Commerce Clause is that the state may not "benefit in-state economic interests by burdening out-of-state competitors." *West Lynn Creamery,* 512 U.S. at 199, 114 S.Ct. at 2214.

The plaintiffs assert that the Wisconsin regulatory scheme directly regulates interstate commerce and/or places a burden on interstate commerce in excess of any benefits which might accrue from the statute. In *Brown–Forman Distillers Corp. v. New York State Liquor Authority,* 476 U.S. 573, 106 S.Ct. 2080, 90 L.Ed.2d 552 (1986), the Supreme Court discussed the two-tiered test to analyze state economic regulations and laws under the Commerce Clause:

> When a state statute directly regulates or discriminates against interstate commerce, or when its effect is to favor in-state economic interests over out-of-state interests, we have generally struck down the statute without further inquiry. *See e.g., Philadelphia v. New Jersey,* 437 U.S. 617 [98 S.Ct. 2531, 57 L.Ed.2d 475] (1978); *Shafer v. Farmers Grain Co.,* 268 U.S. 189 [45 S.Ct. 481, 69 L.Ed. 909] (1925); *Edgar v. MITE Corp.,* 457 U.S. 624, 640–43 [102 S.Ct. 2629, 2639–41, 73 L.Ed.2d 269] (1982) (plurality opinion). When, however, a statute has only indirect effects on interstate commerce and regulates even handedly, we have examined whether the state's interest is legitimate and whether the burden on interstate commerce clearly exceeds the local benefits. *Pike v. Bruce Church, Inc.,* 397 U.S. 137, 142 [90 S.Ct. 844, 847, 25 L.Ed.2d 174] (1970). We have recognized that there is no clear line separating the category of state regulation that is virtually *per se* invalid under the Commerce Clause, and the category subject to the *Pike v. Bruce Church* balancing approach. In either situation, the critical consideration is the overall effect of the statute on both local and interstate activity. *See Raymond Motor Transportation, Inc. v. Rice,* 434 U.S. 429, 440–441 [98 S.Ct. 787, 793–94, 54 L.Ed.2d 664] (1978).

*Id.* at 578–79, 106 S.Ct. at 2084; *see also National Solid Wastes Management Ass'n v. Meyer,* 63 F.3d 652, 661 (7th Cir.1995). In *Brown–Forman,* the Court found that the statute at issue directly regulated interstate commerce and, therefore, was *per se* invalid.

■ In this case, the statute and regulations do not directly regulate interstate commerce. Rather, § 100.22 prohibits milk processors from discriminating between producers in the price paid for milk if the discrimination injures producers or injures, destroys or prevents competition, except if the price difference can be cost justified or was done to meet competition. *See* Wis.Stat. 100.22(3). Section 100.22 seeks to prevent milk processors from offering different prices to different producers or in different

localities. *See White House Milk Co. v. Reynolds,* 12 Wis.2d 143, 150, 106 N.W.2d 441, 445 (Wis.1960).

Section 100.22 does not state whether the producers who sell milk to processors are limited to Wisconsin producers. Nor does it state whether milk processors are limited to milk processors in Wisconsin. The regulations, however, provide definition and clarity to the statute. The regulations limit the application of the statute to milk processors who either hold or are required to hold a Wisconsin dairy plant license who buy milk from producers or to milk processors who operate an out-of-state dairy plant and buy milk from Wisconsin producers.[14] Thus, the statute and regulations taken together limit the application of the statute to dairy plant operators who are required to be licensed in Wisconsin and to only those out-of-state dairy plant operators who purchase milk from Wisconsin dairy farms (producers).

Moreover, it is well-settled that courts can interpret statutes, which may cover matters outside as well as within a state and may be unconstitutional when applied to matters outside the state, to apply only to matters within the state. *See Singer Sewing Machine Co. v. Brickell,* 233 U.S. 304, 313, 34 S.Ct. 493, 496, 58 L.Ed. 974 (1914); *see also, State ex rel. Strykowski v. Wilkie,* 81 Wis.2d 491, 506, 261 N.W.2d 434, 441 (Wis.1978) (whenever a Wisconsin statute can be interpreted in a way as to be either constitutional or unconstitutional, it should be interpreted in a constitutional manner).

In *K–S Pharmacies, Inc. v. American Home Products Corp.,* 962 F.2d 728, 730 (7th Cir.1992), the court of appeals was confronted with a challenge to a Wisconsin statute forbidding price discrimination in wholesale transactions in prescription drugs, Wis.Stat. § 100.31. The statute provided that sellers of prescription drugs "shall offer" to every Wisconsin purchaser the same price afforded "to the most favored purchaser." Wis.Stat. § 100.31(2). The court interpreted the stat-

ute to mean the most favored purchaser in Wisconsin because it concluded that the Wisconsin legislature could not have intended to apply the statute outside of its borders.

In *K–S Pharmacies,* the court noted that "[o]ne staple in the interpretation of federal law is that statutes presumably govern only conduct in the United States." 962 F.2d at 730. The court observed that "states lack any comparable power to reach outside their borders, making the presumption of exclusive domestic application even stronger." (*Id.*) The court also noted that the Supreme Court of Wisconsin, when dealing with laws having extraterritorial potential, has endeavored to conform the legislation to limits on state power. *Id.* at 730 (citing *Consolidated Freightways v. Wisconsin Department of Revenue,* 164 Wis.2d 764, 477 N.W.2d 44 [Wis.1991] ). Applying such principles of statutory construction, the court interpreted the Wisconsin statute as applying only to transactions occurring in Wisconsin and determined that Wis.Stat. § 100.31(2) did not violate the Commerce Clause. *K–S Pharmacies,* 962 F.2d at 731.

Plaintiffs argue that *K–S Pharmacies* is not controlling because it involved a different statute and, more importantly, because Wisconsin was not attempting extraterritorial enforcement as in the instant case. Despite the plaintiff's contentions to the contrary, the rationale of *K–S Pharmacies* is applicable to this case. The challenged statutes in this case are contained in the same chapter of the Wisconsin statutes, Chapter 100, entitled "Marketing; Trade Practices" as the statute challenged in *K–S Pharmacies.* That statute, like the statutes at issue here, prohibits price discrimination by "any person." *See* Wis.Stat. § 100.31(1)(b). Moreover, although Wis.Stat. § 100.31 applied to purchases "in this state," it applied to any seller, in state or out-of-state, who sold prescription drugs in Wisconsin.[15] In this case, the statute and regulations at issue apply to processors who are required to be licensed in Wisconsin and

---

**14.** *See* Wis.Admin.Code §§ 100.01(9) and (19), set forth in full at n. 9. The definitions in § 100.01 were in existence prior to the Emergency Order and were not changed by either the Emergency Order or Final Rule.

**15.** The entirety of Wis.Stat. § 100.31(1)(b) states that, " 'seller' means any person who trades in drugs for resale to purchasers in this state."

only those out-of-state processors who purchase milk from Wisconsin dairy farms.

■ Thus, applying the principles of statutory construction as articulated in *K–S Pharmacies* to the statutes at issue in this case, this court concludes that Wis.Stat. §§ 100.20 and 100.22 apply evenhandedly and any effect on interstate commerce is incidental. This determination is consistent with the Supreme Court's approach in *West Lynn Creamery,* 512 U.S. at 186, 114 S.Ct. at 2205. In that case, Massachusetts had enacted a pricing order subjecting all fluid milk sold by dealers to Massachusetts retailers to an assessment and the entire assessment was distributed only to Massachusetts dairy farmers. *Id.* at 188, 114 S.Ct. at 2209. The court found that the "premium payments" were effectively a tax making milk produced out-of-state more expensive. *Id.* at 194–95, 114 S.Ct. at 2212. The court found the pricing order created an incidental burden on interstate commerce and applied the *Pike* test. *Id.* at 200–10, 114 S.Ct. at 2215.

In light of the foregoing, this court's analysis of the plaintiffs' Commerce Clause challenge proceeds under *Pike,* 397 U.S. at 137, 90 S.Ct. at 844. Under the *Pike* analysis, a statute which regulates evenhandedly to effectuate a legitimate public interest will be upheld unless the burden on interstate commerce is clearly excessive in relation to the local benefits. (*Id.* at 142, 90 S.Ct. at 847.) As succinctly stated in *K–S Pharmacies,* 962 F.2d at 731:

> The dormant commerce clause does not call for proof of a law's benefits, after the fashion of substantive due process, whenever the subject is trade. On the contrary, legislation regulating economic affairs is within public power unless the rules are so silly that a justification cannot even be imagined. *United States Railroad Retirement Board v. Fritz,* 449 U.S. 166, 179, 101 S.Ct. 453, 461, 66 L.Ed.2d 368 (1980); *Vance v. Bradley,* 440 U.S. 93, 110–12, 99 S.Ct. 939, 949–50, 59 L.Ed.2d 171 (1979); *Usery v. Turner Elkhorn Mining Co.,* 428 U.S. 1, 96 S.Ct. 2882, 49 L.Ed.2d 752 (1976); *Northside Sanitary Landfill, Inc. v. Indianapolis,* 902 F.2d 521 (7th Cir. 1990).

Section 100.22, Wis.Stat., is an anti-price discrimination statute which prohibits buyers of milk (processors) from discriminating between dairy farmers (producers) in the price paid for their milk, if the discrimination injures producers or competing processors. "Laws forbidding price discrimination have plausible justifications." *K–S Pharmacies,* 962 F.2d at 731.

The purpose of Wis.Stat. § 100.22 is to prevent injury to competition by insuring that dairy farmers compete on a level playing field. In enacting the Final Rule, the DATCP recognized that many processors apparently were paying higher prices to some producers which could not be justified on the basis of milk quality or differences in procurement costs. The DATCP concluded that discriminatory milk prices may injure other milk producers and processors and also may contribute to unwarranted concentration in the dairy industry. Wisconsin has a legitimate public interest in preserving competition. The Supreme Court has "recognized the legitimate interests of a State in maximizing the financial return to an industry within it." *Pike,* 397 U.S. at 143, 90 S.Ct. at 848 (citation omitted). It is not for this court to question the wisdom of the Wisconsin policy or to provide alternative ways of solving a problem. *Western & Southern Life Ins. Co. v. State Bd. of Equalization,* 451 U.S. 648, 670, 101 S.Ct. 2070, 2084, 68 L.Ed.2d 514 (1981); *Bibb v. Navajo Freight Lines, Inc.,* 359 U.S. 520, 524, 79 S.Ct. 962, 964–65, 3 L.Ed.2d 1003 (1959).

This court finds that the Wisconsin's regulatory scheme's burden on interstate commerce does not clearly exceed its local benefits. The statute's only burdens on interstate commerce are to regulate out-of-state processors who purchase milk from Wisconsin producers and to regulate processors required to be licensed in Wisconsin who purchase any milk from producers. Given the legitimate purpose of the statute and regulations, this court cannot find that their small burden on interstate commerce outweighs their local benefits. Rather, the state's regulatory scheme appears to serve its local purpose with the least possible impact on inter-

state commerce. *See Pike* at 142, 90 S.Ct. at 847.

In seeking a preliminary injunction, the plaintiffs rely upon *Allen v. State of Minn.,* 867 F.Supp. 853 (D.Minn.1994). In *Allen,* the court addressed a challenge to Minnesota statutes which the state had interpreted as prohibiting the payment of volume premiums to milk producers. The court determined that the statutes had only indirect effects on interstate commerce and regulated even-handedly. *Allen,* 867 F.Supp. at 860. The court then applied the *Pike* analysis and balanced the local benefits of the statute against the burden it placed on interstate commerce. The court concluded that the statutes violated the Commerce Clause and also the Contract Clause of the United States Constitution.

*Allen* is distinguishable from this case. First, *Allen* addressed the constitutionality of Minnesota statutes, not the Wisconsin statutes at issue in this case. Second, Minnesota's statutory scheme was interpreted by the state to completely prohibit the payment of volume premiums to milk producers. The Wisconsin statutes at issue do not prohibit the payment of volume premiums. Volume premiums are permissible under Wisconsin statutes if they can either be cost justified or are necessary to meet competition. *See* Wis. Stat. § 100.22(3). In fact, the plaintiffs in this action failed to demonstrate that, even under the expired Emergency Order, any volume premiums which they currently receive would not satisfy the state standards for cost justification and also would not satisfy the standard for payment of volume premiums to meet the competition.

Finally, in *Allen,* the state of Minnesota asserted that its prohibition against the payment of volume premiums protected small farmers by allowing them to accurately compare price offers received from processors and by protecting them from having to finance the payment of volume premiums paid to large producers. (*Id.* at 861.) In this case, the parties have presented no evidence that when the Wisconsin legislature enacted Wis.Stat. § 100.22, it had a similar intent.

The plaintiffs also argue that the enforcement of Wis.Stat. § 100.22 will affect the Basic Formula Price (BFP) and, therefore, affect interstate commerce. The economic experts who testified at the hearing agreed that the BFP would be affected by enforcement of the Wisconsin volume premium regulatory scheme. However, neither expert quantified the extent to which the BFP would be influenced. Notably, there was also evidence presented that the non-enforcement of Wis.Stat. § 100.22 would also affect the BFP. Thus, on balance, the plaintiffs have not established that the impact of the regulatory scheme on the BFP outweighs Wisconsin's interest in prohibiting payment of discriminatory and unjustified volume premiums.

In sum, the plaintiffs have not established that Wisconsin's regulatory scheme is an excessive burden on interstate commerce. Accordingly, this court concludes that the plaintiffs have failed to meet their burden of showing some likelihood of success on the merits of their claim that Wis.Stat. §§ 100.20 and 100.22 and the Emergency Order, to the extent that it is compatible with the currently existing Final Rule, are unconstitutional under the Commerce Clause.

The plaintiffs also assert that the statutes violate the Contracts Clause of the United States Constitution. The Contracts Clause provides that "[n]o State shall ... pass any ... law impairing the obligation of contracts." U.S. Const. Art. I, Sec. 10, Clause 1. The Supreme Court has developed a three-part test to evaluate whether a state statute violates the Contract Clause. *General Motors v. Romein,* 503 U.S. 181, 186, 112 S.Ct. 1105, 1109–10, 117 L.Ed.2d 328 (1992); *Allied Structural Steel v. Spannaus,* 438 U.S. 234, 244, 98 S.Ct. 2716, 2722, 57 L.Ed.2d 727 (1978); *Energy Reserves Group, Inc. v. Kansas Power & Light Co.,* 459 U.S. 400, 404, 103 S.Ct. 697, 700–01, 74 L.Ed.2d 569 (1983). The three-part inquiry is as follows:

1) whether there is a contractual relationship;

2) whether a change in law impairs the contractual relationship; and

3) whether the impairment is substantial.

*General Motors,* 503 U.S. at 186–87, 112 S.Ct. at 1109–10. In determining the extent

of the impairment, the extent of the regulation to which the industry has historically been subjected may be considered. *Allied Structural Steel,* 438 U.S. at 242–43, n. 13, 98 S.Ct. at 2721–22, n. 13.

The prohibition in the Contract Clause against the impairment of contracts is not to be given a literal leading. *W.B. Worthen Co. v. Thomas,* 292 U.S. 426, 433, 54 S.Ct. 816, 818–19, 78 L.Ed. 1344 (1934). The absolute language of the prohibition must be read to accommodate the inherent police power of the state "to safeguard the vital interests of its people." *Home Building & Loan Ass'n. v. Blaisdell,* 290 U.S. 398, 434, 54 S.Ct. 231, 239, 78 L.Ed. 413 (1934). The limits imposed on a state within the contours of the Contract Clause has been more recently explained by the Supreme Court as follows: "[l]egislation adjusting the rights and responsibilities of contracting parties must be upon reasonable conditions and of a character appropriate to the public purpose justifying its adoption." *United States Trust Co. v. New Jersey,* 431 U.S. 1, 22, 97 S.Ct. 1505, 1518, 52 L.Ed.2d 92 (1977).

■ Plaintiffs Neumann and Fetzer Farms demonstrated that they have long-term procurement contracts with Land O' Lakes in Arden Hills, Minnesota. However, the payment of volume premiums is not a term of those contracts.[16] The evidence before the court establishes that volume premium schedules set by processors can be changed unilaterally and are not a part of the procurement contracts between processors and producers. Accordingly, none of the plaintiffs have established some likelihood of success on their Contract Clause claim.

The plaintiffs also contend that Wisconsin's action is preempted by federal law. When the federal government acts within its constitutional authority, it is empowered to preempt state or local laws to the extent it believes such action to be necessary to achieve its purposes. *DeHart v. Town of Austin, Ind.,* 39 F.3d 718, 721 (7th Cir.1994).

The Supremacy Clause of the United States Constitution authorizes this federal action, and the phrase "Laws of the United States" of Article VI, Clause 2 encompasses both federal statutes and federal regulations. *See Louisiana Public Service Com'n v. F.C.C.,* 476 U.S. 355, 368–69, 106 S.Ct. 1890, 1898–99, 90 L.Ed.2d 369 (1986).

Preemption occurs in three situations. *DeHart,* 39 F.3d at 721. Congress may define expressly to what extent a federal statute preempts a state or local law. *(Id.)* Preemption may also be inferred when a pervasive scheme of federal regulation makes it reasonable to conclude that Congress intended exclusive federal regulation of the area. *(Id.)* (citing *English v. General Elec. Co.,* 496 U.S. 72, 79, 110 S.Ct. 2270, 2275, 110 L.Ed.2d 65 [1990] ). Finally, where state or local law actually conflicts with federal law, state or local law must give way. *DeHart,* 39 F.3d at 721 (citing *Ridgway v. Ridgway,* 454 U.S. 46, 54–55, 102 S.Ct. 49, 54–55, 70 L.Ed.2d 39 [1981] ). The Supreme Court has made it clear that the presumption against preemption is very strong. *Gade v. National Solid Wastes Management Ass'n,* 505 U.S. 88, 109, 112 S.Ct. 2374, 2388–89, 120 L.Ed.2d 73 (1992).

There is no contention that Congress expressly provided that the federal milk marketing system preempts state or local law. Nor do the plaintiffs argue that there is a pervasive scheme of federal regulation from which exclusive federal regulation can be inferred or that the state law actually conflicts with federal law. Rather, the plaintiffs argue that the state's restriction of volume premiums in Wisconsin conflicts with congressional purposes and objectives as implemented under the federal milk marketing order system.

■ Even if, as Dr. Ault testified, the restriction of volume-based premiums in Wisconsin will result in a reduction of the BFP, the plaintiffs have not established that Wisconsin's restrictions on volume premiums will

---

**16.** Plaintiff Pagel averred that he "currently has contracts with processors which include the payment of volume premiums." Plaintiffs' Exh. 35 ¶ 5. However, he does not aver that such contracts are long-term procurement contracts nor does he provide any detail regarding these contracts. Moreover, plaintiff Pagel has not established that any volume premiums which he currently receives would not pass muster under the state's regulatory scheme.

conflict with the purpose of federal milk marketing orders. Nor have the plaintiffs shown that the state's regulatory scheme actually conflicts with the AMAA or that Congress intended exclusive federal regulation of all aspects of milk pricing. Accordingly, this court concludes that the plaintiffs have not met their burden of showing that Wis.Stat. § 100.22 conflicts with the congressional purpose in enacting the AMAA. Therefore, they have not established some likelihood of success on their preemption claim.

### Summary

In sum, this court concludes that the plaintiffs have failed to establish that a preliminary injunction should be issued in this action. They have failed to demonstrate that they will suffer irreparable harm if the preliminary injunction is not issued. Moreover, they have failed to show "some likelihood of success on the merits" on their Commerce Clause, Contracts Clause or their preemption challenges. Accordingly, the plaintiffs' motion for a preliminary injunction will be denied.

### ORDER

**NOW, THEREFORE, IT IS ORDERED** that the plaintiffs' motion for a preliminary injunction be and hereby is **DENIED.**

The court will conduct a telephone status conference on Thursday, October 17, 1996, at 10:00 a.m. to discuss further proceedings in this matter. The court will initiate the call.