**DEAN FOODS COMPANY, Plaintiff,**

**v.**

**Alan T. TRACY, Secretary of the Wisconsin Department of Agriculture, Trade and Consumer Protection, Defendant.**

No. 96–C–875–C.

United States District Court,
W.D. Wisconsin.

Dec. 23, 1997.

William M. Conley, Foley & Lardner, Madison, WI, for plaintiff.

Susan K. Ullman, Assistant Attorney General, Madison, WI, for defendants.

## OPINION AND ORDER

CRABB, District Judge.

Plaintiff Dean Foods Company is a northern Illinois milk processor. It brings commerce and supremacy clause challenges against new Wisconsin administrative regulations relating to payments of "volume premiums" to Wisconsin dairy farmers. Such premiums provide farmers who deliver larger volumes of milk more .revenue .per unit of

delivered milk. Plaintiff seeks declaratory and injunctive relief against enforcement of the regulations to the extent that they prevent plaintiff from employing its business plan of offering volume premiums to Wisconsin dairy farmers that transport their milk across the border for delivery to plaintiff's Illinois plants. Plaintiff wants to pay volume premiums to encourage its milk farm suppliers to expand production and to encourage other farmers to expand production and supply plaintiff.

Defendant Alan E. Tracy moves to dismiss for lack of subject matter jurisdiction, contending that plaintiff has not suffered any "injury" to satisfy Article III's "case or controversy" requirement. Alternatively, defendant moves for summary judgment dismissing plaintiffs two claims because plaintiff has not made a sufficient showing that the challenged regulations affect interstate commerce or that the regulations conflict with federal milk marketing laws.

I conclude that plaintiff's allegations establish that it has suffered an "injury" satisfying Article III's "case or controversy" requirement. Plaintiff alleges that it has offered volume premiums for many years and that the new regulations cast doubt on its ability to continue this practice. However, I agree with defendant that plaintiff has not produced sufficient evidence concerning the effect that the Wisconsin regulations have on interstate commerce to meet its burden at trial of proving that the regulations violate the commerce clause. In addition, I agree with defendant that plaintiff will not be able to meet its burden of establishing that the Wisconsin regulations conflict with the operation of federal milk marketing laws. Therefore, I conclude that defendant is entitled to summary judgment dismissing both counts of plaintiff's complaint.

Plaintiff and defendant have submitted proposed findings of fact and responses to these respective proposals. Defendant's filings challenge many of plaintiff's proposed facts. I have categorized the proposed facts as undisputed and disputed.

## UNDISPUTED FACTS

Plaintiff Dean Foods Company is a Delaware corporation with its principal place of business in Franklin Park, Illinois. Among other things, plaintiff is a milk processor that owns and operates four dairy plants in northern Illinois. Its wholly owned subsidiary, Dean Milk Procurement, Inc., leases two raw milk transfer facilities in Janesville and Schullsburg, Wisconsin, where it purchases raw milk from Wisconsin dairy farms for processing at plaintiff's plants. Defendant Alan T. Tracy is Secretary of the Wisconsin Department of Agriculture, Trade and Consumer Protection.

Historically, plaintiff and other milk processors have offered dairy farmers "volume premiums," that is, an amount over the base price paid per unit of raw milk when the milk is delivered in larger quantities. One business justification for such premiums is that dairy processors incur less net expense for raw milk when they purchase from a limited number of farmers. Another reason is to encourage larger farmers to stay in business and remain stable, high-volume sources of raw milk. Total milk production in plaintiff's purchasing market, the upper Midwest, is in decline. The market has lost many small herd, low volume producers that have had difficulty facing out-of-state competition, particularly competition from the southwestern and western regions of the United States. The surviving farms have been mostly large herd farms. Payment of volume premiums encourages the development of more large herd, high volume producers and encourages existing high volume producers to stay in business, ensuring plaintiff efficient sources of raw milk.

Wisconsin Statutes §§ 100.20 and 100.22 prohibit price discrimination in the purchase of milk and authorize the Wisconsin Department of Agriculture, Trade and Consumer Protection to establish regulations governing specific practices in the industry. In October 1996, regulations were enacted relating to payments of volume premiums. See Wis.Admin.Code §§ ATCP 100.98–987. The regulations proscribe the payment of volume premiums by milk processors unless the premiums are justified by differences in

milk quality, the costs of procurement, the need to meet competition or the need to comply with a federal milk marketing order. The department has authority to seek injunctions against milk purchasers who violate the regulations and to impose civil penalties on violators. A private party harmed by a violation may pursue an action against the violator and is entitled to double damages, costs and attorney fees.

In October 1996, plaintiff and Dean Milk Procurement established two milk buying programs available to Wisconsin dairy farmers. Dean Milk Procurement pays "Option I" volume premiums for milk it purchases at Wisconsin dairy farms. Under Option 1, Dean Milk Procurement picks up and takes title to the milk at the dairy farm. Volume premiums paid under Option 1 are cost-justified under the Wisconsin regulations.

Plaintiff pays "Option 2" volume premiums for milk it purchases at its dairy plants in northern Illinois. These northern Illinois plants are located close enough to the border so that Wisconsin dairy farmers can make deliveries to plaintiffs plants.

## DISPUTED FACTS

The parties dispute the extent to which Dean Milk Procurement has spoken to Wisconsin dairy farmers about its two volume premium programs, whether plaintiff enters into contracts with Wisconsin farmers for delivery of milk to plaintiff's Illinois plants and whether plaintiff takes title to Wisconsin-produced milk before it arrives at plaintiffs Illinois plants.

Also, the parties dispute whether the new volume premium regulations interfere with plaintiff's Option 2 program and impede its access to Wisconsin milk, whether they impair plaintiff's ability to compete with other milk processors who are free to offer volume premiums in their states, whether they prevent high volume Wisconsin dairy farmers from participating in what is an interstate market for milk, whether they protect Wisconsin-based milk processors from out-of-state competition that offers volume premiums and whether the net effect of the regulations is to isolate the Wisconsin milk market from the national milk market.

## OPINION

### A. *Introduction*

According to the complaint, plaintiff is seeking both a declaration that the Wisconsin volume premium regulations are unconstitutional as applied to its Option 2 purchasing program and an injunction barring defendant from enforcing the regulations against plaintiff for making milk purchases from Wisconsin dairy farms under the program. Plaintiff asserts that jurisdiction exists over its commerce and supremacy clause challenges pursuant to the general federal question statute, 28 U.S.C. § 1331. However, defendant contends that plaintiff lacks standing because plaintiff has not suffered an "injury" to satisfy the "case or controversy" requirement of Article III. *See generally Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). Separately, defendant asserts that plaintiff has no chance of success in proving its constitutional claims. He argues that plaintiff has not produced sufficient documentary evidence that the regulations affect interstate commerce significantly or conflict with federal milk marketing laws and that plaintiff could not prove these essential elements of its commerce clause and supremacy clause claims at trial. *See generally Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Defendant seeks summary judgment dismissing plaintiff's two claims.

### B. *Standing*

Defendant begins by arguing that plaintiff has not been injured because the department has no current plans to take action against plaintiff's Option 2 program. Defendant cites a handful of Seventh Circuit cases, arguing that they require dismissal in such circumstances. Plaintiff responds that as a matter of law it need not establish that enforcement is threatened and that as a matter of fact there is a genuine threat of enforcement.

Plaintiff is correct that a party is not required to show actual or contemplated enforcement of a law before bringing a declaratory challenge to the law. *See Hays v. City of Urbana*, 104 F.3d 102, 103 (7th Cir.), *cert.*

*denied,* —— U.S. ——; 117 S.Ct. 2433, 138 L.Ed.2d 195 (1997). In *Hays,* plaintiff landlords challenged a housing ordinance that prohibited them from considering a prospective tenant's source of income when reviewing rental applications. The purpose of the ordinance was to protect Section 8 housing subsidy recipients from discrimination. The landlords brought a preemption challenge to the ordinance that was dismissed when the district court found there was no threat of enforcement and therefore no Article III case or controversy. The city attorney had told the district court that he had "no immediate plan" to enforce the ordinance. *Id.* at 103.

The district court's analysis was rejected by the court of appeals, which explained that the Supreme Court had recognized that a party "who must comply with a law or face sanctions has standing to challenge its application" and therefore a party need not show that the law is being enforced or will be enforced. *Hays,* 104 F.3d at 103 (citing *Pierce v. Society of Sisters,* 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070 (1925) and noting that Supreme Court ruled on the constitutionality of statute two years before statute's effective date). Indeed, if defendant were correct and a party seeking declaratory relief had to show an actual threat of enforcement, a state could evade declaratory review forever by ceasing enforcement activities once the law was challenged, thereby making the case moot, only to "return to old tricks once the coast is clear." *Magnuson v. City of Hickory Hills,* 933 F.2d 562, 565 (7th Cir.1991).

In addition, defendant's no-threat-of-enforcement theory is not supported by the record. Like the city attorney in *Hays,* defendant states in his brief. "As of this date, the Department has neither taken nor threatened any enforcement action against the 'Option Two' procurement program Dean Foods has 'outlined' on paper in the Complaint." Defendant's Memorandum of Law in Support of its Motion to Dismiss, or in the Alternative for Summary Judgment ("Defendant's Memorandum") (Dkt.# 15) at 14. Right after this statement, he includes a parenthetical: "However, this is not to say that the Department will not take action against Dean Foods based on its actual practices in obtaining the milk for which it pays 'Option Two' premiums." *Id.* Defendant's second statement reveals that plaintiff is being monitored and faces a *threat* of enforcement.

■ Defendant makes a better argument that plaintiff has not alleged facts showing that the new volume premium regulations have affected its business adversely, causing it an "injury" for Article III purposes. As clearly as *Hays* rejects the idea that a party asserting a declaratory challenge must produce evidence of an enforcement threat, it instructs that the party must show how the law results in "a concrete injury, redressable by success in the litigation." *Hays,* 104 F.3d at 103; *see also Nuclear Engineering Co. v. Scott,* 660 F.2d 241, 252 (7th Cir.1981) (elaborating that the injury may not be "[u]ncertain or speculative business injury"). Plaintiff and defendant dispute vigorously what a party must show before a sufficient "injury" may be found under *Hays* and *Nuclear Engineering,* and one other case that interpreted *Nuclear Engineering, State of Illinois v. General Electric Co.,* 683 F.2d 206 (7th Cir.1982) and whether plaintiff has shown it. A detailed examination of these cases is warranted.

In *Hays,* the landlords argued that they were injured because if the city ordinance forced them to accept Section 8 tenants (that is, they could no longer screen these tenants out during the application process), they would have to enroll in the Section 8 program, which they claimed was a costly process. *Hays,* 104 F.3d at 104. However, the landlords failed to show (or even allege) that their apartments were eligible for Section 8 certification and were found not to have standing. The court of appeals surmised that the landlords had withheld such facts from the record deliberately because they wanted a judicial ruling that the city could not make them rent to Section 8 tenants without being held to an admission that their apartments were suitable for Section 8 tenants. The court concluded that the landlords had tried to place themselves in a "no lose position" and that their risk averse posture made their action into a quest for an advisory

opinion, the hallmark of which is that the party faces no risk from an adverse result. *See id.*

In *Nuclear Engineering,* 660 F.2d at 241, the operator of a nuclear waste storage facility brought an action for declaratory and injunctive relief against the Attorney General of Illinois after he had made a public announcement that he was going to sue Nuclear Engineering and other waste storage operators for violations of state environmental laws. Nuclear Engineering attempted to head the attorney general off at the pass in federal court, asking the court to declare that it was in full compliance with federal, state and local laws and to enjoin the attorney general from initiating any actions to the contrary. Regarding its Article III injury, Nuclear Engineering alleged that the attorney general's threat of enforcement was causing its clients to seek out other waste site operators and making its lenders and investors wary. *See id.* at 243–44.

The district court did not address the standing issue, although the court of appeals conducted its own "careful examination of the record," seeking evidence that the attorney general's public comments caused Nuclear Engineering "immediate business costs." *Nuclear Engineering,* 660 F.2d at 252. Because the court of appeals did not find "a shred of evidence" that Nuclear Engineering did face a threat of "immediate business injury," the court determined that Nuclear Engineering did not have standing. *Id.*

*General Electric,* 683 F.2d at 206, is another case that involved the possible effects of state regulatory enforcement on a nuclear waste facility. General Electric was operating a spent fuel storage facility at Morris, Illinois (the only one in the United States), when the state passed a law prohibiting the movement of spent fuel generated outside Illinois within the state and the disposal of such materials at Illinois sites. General Electric and out-of-state waste producers brought a declaratory action, charging that the law violated the commerce and supremacy clauses. The waste producers alleged that they stood ready to ship spent fuel to the facility and General Electric alleged that it was ready to receive it. *Id.* at 208.

The court of appeals determined that the plaintiffs had suffered an injury and that there was a justiciable controversy. *General Electric,* 683 F.2d at 209. The court explained that Article III expresses a policy against judicial proceedings that are "unnecessary to resolve a real dispute or unlikely to be made in a competent fashion." *Id.* at 210. When a party sues a state before that state has taken action against the plaintiff, the lack of actual conflict may deprive the court of facts necessary to making an informed decision and reduce the parties' incentives "to make a real contest of the case." *Id.* The court found the plaintiffs' claim did not raise such concerns because the facts were clear that a interstate shipment was destined for the facility at Morris and the new law plainly barred that shipment from entering Illinois, *Id.*

Interestingly, in *General Electric,* the court distinguished the plaintiffs' quandary from that faced by Nuclear Engineering, noting that Nuclear Engineering had not challenged the validity of any law, but rather, had sought a declaration that it was in *compliance* with applicable laws. Hence, unlike the plaintiffs in *General Electric,* Nuclear Engineering was not injured; the only threat it faced was having to defend a lawsuit that, according to its allegations, it believed it would win. *See General Electric,* 683 F.2d at 210 (citing *Nuclear Engineering,* 660 F.2d at 252).

In defendant's mind, plaintiff is like the landlords in *Hays* and the waste site operator in *Nuclear Engineering* because plaintiff has not shown that the volume premium regulations have caused any injury to its business. Defendant notes that he deposed Gary Corbett, plaintiff's Vice President for Governmental and Dairy Relations, about the firm's efforts to put the Option 2 program in effect. When asked whether dairy farmers had been discouraged from participating in the program, Corbett said only that he had heard from another producer that farmers were concerned about the "overhanginginess" of the regulations. *See* Deposition of Gary A. Corbett (Dkt.# 37) at 52. Defendant argues that this evidence is insufficient

to support a finding that plaintiff has suffered an "injury" for Article III purposes.

Defendants' view of injury is too narrow. Plaintiff has alleged a sufficient business injury to satisfy Article III's case or controversy requirement. Viewing the undisputed facts in plaintiff's favor, as I must, *see Lujan*, 504 U.S. at 561, I find that plaintiff has offered volume premiums to dairy farmers for many years. Although it offered them for cost savings, and may continue to offer them for this reason under the new volume premium regulations, *see* § ATCP 100.983 (cost-justification defense), plaintiff offered volume premiums for the additional reason that it believes that bigger dairy farms are better and it wants to encourage development of bigger farms. Apparently, the new regulations do not permit volume premiums that are offered to stimulate dairy farm growth. Plaintiff is injured because a new law has outlawed what it once did and what it wants to continue to do. *See General Electric*, 683 F.2d at 210. Moreover, the fact that this court could ride that these new regulations are constitutional, effectively putting an end to plaintiff's historical practice, means that plaintiff has accepted enough risk by initiating this litigation that it should be a real contest. *See Hays*, 104 F.3d at 104; *General Electric*, 683 F.2d at 210. Plaintiff has standing to bring its declaratory challenge to the Wisconsin volume premium regulations.

Defendant offers an additional argument why plaintiff has not suffered a business injury. He notes that plaintiff's position is that its Option 2 volume premium program applies only to transactions that occur outside Wisconsin and hence, is outside the reach of department authority. Plaintiff claims that it pays Option 2 premiums for whatever milk arrives at its plant in large enough quantities, be it from Wisconsin cows or cows of any other state. Defendant argues that because plaintiff believes the department has no authority to regulate plaintiffs Option 2 transactions, plaintiff is feigning a business injury, like the waste site operator in *Nuclear Engineering*. By its own reasoning, plaintiff would win any enforcement action that is actually taken

against it because of its Option 2 program. *See General Electric*, 683 F.2d at 210 (citing *Nuclear Engineering*, 660 F.2d at 252). Defendant is partially correct: plaintiff does believe that it would win a case brought against it by the department. Nonetheless, plaintiff's declaratory challenge may be distinguished from the challenge presented by the waste site operator in *Nuclear Engineering*. Although plaintiff contends that it would win, it is not because in its view, Option 2 complies with the regulations, it is because applying the regulations against Option 2 would be unconstitutional. Unlike the waste site operator in *Nuclear Engineering*, plaintiff is not asserting that it will have to defend Option 2 against a meritless attack. Plaintiff is asserting that it will have to defend its Option 2 program against an unconstitutional attack. *Cf. General Electric*, 683 F.2d at 210 ("Nuclear Engineering was not challenging the validity of the state laws that the Attorney General was seeking to enforce against it."). That plaintiff faces a regulation that it believes is unconstitutional and that it believes applies to its business give it standing to challenge the regulation.

 Defendant offers one last reason why the court should dismiss plaintiffs claims. Because this is a declaratory judgment action, it is permissible to decline to exercise jurisdiction out of concern for the public interest, avoiding unnecessary federal court decisions or plaintiff's lack of need for the declaration. *See International Harvester Co. v. Deere & Co.*, 623 F.2d 1207, 1217–18 (7th Cir.1980). Defendant is concerned that allowing plaintiff to pursue this case will signal to other out-of-state operators that they too should bring declaratory judgment actions testing their volume premium programs and asks that the court decline jurisdiction.

The Wisconsin regulations have been in effect for more than one year, yet this is the first time they have been challenged in court by a milk processor. Defendant's fear about an influx of cases appears unfounded. Moreover, defendant has much to gain should it win on the merits. Although a decision rejecting plaintiff's program will not have preclusive effect on other milk processors as a

matter of law, the decision will have that effect as a practical matter because other processors will be less likely to bring a challenge if their programs are similar to plaintiff's program. Defendant has as much to gain as to lose from an examination of the merits.

### C. Commerce Clause

There is no dispute that it costs less for milk processors to buy raw milk from a limited number of dairy farms. Plaintiff believes that it also makes good business sense to pay large dairy farmers more for their milk because the practice encourages "producer expansion." *See* Plaintiff's Brief in Opposition to Motion to Dismiss or for Summary Judgment (Dkt.# 28) at 14. Offering what will be termed "incentive volume premiums" not only ensures plaintiff continuing access to the large dairy farms that efficiently supply it with raw milk, but also helps the upper Midwest dairy industry remain competitive in an interstate market that favors large farms. *Id.* at 17. The economic problem plaintiff sees in the Wisconsin regulations is that the prohibition on incentive volume premiums is a poor way to serve whatever public interest may lie in protecting small dairy farms. *Id.* at 18. Plaintiff sees a constitutional flaw in the Wisconsin regulations as well: they isolate Wisconsin from the interstate milk market. *See id.* The regulations dam what would be the free flow of milk from large Wisconsin dairy farms to out-of-state milk processors and prevent open competition between the Wisconsin milk processors who cannot pay incentive volume premiums and out-of-state milk processors who can. *See id.* at 14.

■ The commerce clause authorizes courts to review state laws that are alleged to advance a state's own interests to the detriment of free flowing interstate commerce. *See National Solid Wastes Management Ass'n v. Meyer,* 63 F.3d 652, 657 (7th Cir.1995) (citing *Fort Gratiot Sanitary Landfill, Inc. v. Michigan Dep't of Natural Resources,* 504 U.S. 353, 359, 112 S.Ct. 2019, 119 L.Ed.2d 139 (1992)), *cert. denied,* 517 U.S. 1119, 116 S.Ct. 1351, 134 L.Ed.2d 520 (1996). Such review is conducted in recognition of "the Constitution's special concern

both with the maintenance of a national economic union unfettered by state-imposed limitations on interstate commerce and with the autonomy of the individual States within their respective spheres." *Healy v. The Beer Institute,* 491 U.S. 324, 335–36, 109 S.Ct. 2491, 105 L.Ed.2d 275 (1989) (footnotes omitted).

■ A two-tiered approach applies when reviewing state laws for possible violations of the commerce clause. *See National Solid Wastes,* 63 F.3d at 657; *but see National Paint & Coatings Ass'n v. City of Chicago,* 45 F.3d 1124, 1131 (7th Cir.) (advocating a three-tiered approach), *cert. denied,* 515 U.S. 1143, 115 S.Ct. 2579, 132 L.Ed.2d 829 (1995). When the state law attempts to regulate interstate commerce directly or the state law has the effect of favoring in-state economic interests over out-of-state economic interests, generally the law is declared void " 'without further inquiry.' " *See National Solid Wastes,* 63 F.3d at 657 (quoting *Brown–Forman Distillers Corp. v. New York State Liquor Auth.,* 476 U.S. 573, 579, 106 S.Ct. 2080, 90 L.Ed.2d 552 (1986)); *see also National Paint & Coatings,* 45 F.3d at 1131 (describing those state laws as "all but *per se* unconstitutional"). Alternatively, when the state law is neutral on its face or has only indirect effects on interstate commerce, it will be upheld " 'unless the burden imposed on [interstate] commerce is clearly excessive in relation to the putative local benefits.' " *See National Solid Wastes,* 63 F.3d at 657 (quoting *Pike v. Bruce Church, Inc.,* 397 U.S. 137, 142, 90 S.Ct. 844, 25 L.Ed.2d 174 (1970)).

■ The Wisconsin volume premium regulations apply equally to in-state and out-of-state milk processors that buy from Wisconsin dairy farms. The regulations define "dairy plant operators" as persons who hold Wisconsin dairy licenses and out-of-state milk processors that buy milk from Wisconsin farms for delivery to their plants. § ATCP 100.01(9). Because of the seemingly neutral treatment of in-state and out-of-state interests, the parties do not dispute that the regulations should be evaluated un-

der the test set out in *Pike,* 397 U.S. at 142.[1]

Although the parties agree about how the court should evaluate the regulations, they dispute whether a trial is necessary. For plaintiff to succeed on its *Pike*-based commerce clause challenge, it will have to show that the prohibition on the historical practice of offering incentive volume premiums creates a burden on the interstate milk market that outweighs any Wisconsin state interest furthered by the prohibition of incentive volume premiums. *See National Solid Wastes,* 63 F.3d at 657. Hence, an essential element of plaintiff's case will be establishing the effect that the regulations have on interstate commerce. However, plaintiff has not produced enough documentary evidence to show it could prove any such effects at trial.

Plaintiff has submitted various proposed findings of fact concerning its theory about the interstate effects of the Wisconsin regulations. It asserts that "[i]f the Rule is applied to out-of-state transactions such as those which occur under 'Option 2,' Dean will show that the rule will have the effect of isolating Wisconsin from the interstate market." Plaintiff's Proposed Findings of Fact and Conclusions of Law (Dkt.# 29) at ¶ 20. Moreover, plaintiff proposes to show that it and other out-of-state milk processors "will be impaired in their ability to compete across state lines by offering volume premiums to Wisconsin producers in appropriate circumstances and denied unfettered access across the border to Wisconsin producers." *Id.* Further, plaintiff asserts that it will reveal at trial how the Wisconsin regulations barring payment of incentive volume premiums "will have the effect of isolating Wisconsin producers who might wish to participate fully in the interstate market and protecting those Wisconsin processors who do not wish to face interstate competition." *Id.* at ¶ 21

These proposed findings of fact are for the most part supported by an affidavit of Gary Corbett, plaintiff's Vice President for Governmental and Dairy Industry Relations, who has experience as a dairy farmer and dairy economist. At Corbett's deposition, plaintiff stipulated that he is an expert witness. *See* Corbett dep. at 4. Nonetheless, the portions of his affidavit that are cited to support plaintiff's interstate commerce theory fail the standards demanded of expert witnesses. It is well settled that affidavits of expert witnesses cannot contain just conclusory statements of their ultimate opinions: the affidavits must reveal "a process of reasoning beginning with a firm foundation." *See Mid–State Fertilizer v. Exchange Nat. Bank,* 877 F.2d 1333, 1338–39 (7th Cir.1989). In the portions of Corbett's affidavit submitted in support of plaintiff's theory of interrupted interstate commerce, he cites no studies or reports that form the basis of his proposed testimony about the isolation of Wisconsin's dairy market. For the most part, his affidavit simply matches what plaintiff submits as proposed findings of fact. *Compare* Plaintiff's Proposed Findings of Fact at ¶¶ 20–22 *with* Affidavit of Gary Corbett (Dkt.# 32) at ¶¶ 24–26. The testimony of this proposed expert witness is not sufficient to demonstrate that plaintiff can adduce sufficient evidence at trial to support its theory of a commerce clause violation.

Eliminating Corbett's expert testimony may not require dismissal of plaintiff's commerce clause claim if plaintiff's other evidence is sufficient to warrant a trial. Although Corbett does not qualify as an expert, he is in a position to have first hand knowledge of how the volume premium regulations have affected plaintiff's interstate operations. Additionally, plaintiff's findings of fact relating to the interstate effects of the volume premium regulations cite parts of the deposition plaintiff took of defendant's expert. Accordingly, I have reviewed the remainder of Corbett's affidavit, its exhibits and relevant portions of his deposition and the cited portions of defendant's expert's deposition to gauge whether these materials contain evidence warranting a trial on plaintiff's commerce clause claim.

---

1. Plaintiff states: "If the *Pike* test is applied, summary judgment is inappropriate. Dean does contend that the burden on interstate commerce outweighs any local benefit and this issue should be resolved at trial." Plaintiff's Brief in Opposition to Motion to Dismiss or for Summary Judgment (Dkt.# 28) at 14.

Gary Corbett explained in his deposition that plaintiff has records concerning the herd size of the dairy farms it buys from and the herd size of potential suppliers that have failed, and that it uses the information to identify an optimal herd size for its suppliers and accordingly set the level of its incentive volume premiums. *See* Corbett Dep. at 18–20. Also, Corbett stated that plaintiff purchased 100,000,000 pounds of milk a month and that 70 to 75% of it came from Wisconsin dairy farms, although he found it "hard to say" how much of these monthly purchases were affected by the Wisconsin regulations because plaintiff has been in the process of changing its purchasing strategy. *See id.* at 39–40. Further, Corbett stated in his affidavit that thirteen dairy farmers had begun selling to Dean Milk Procurement since October 1996; he clarified during his deposition that eleven of these farmers were Wisconsin-based and that all thirteen farmers were part of a volume premium program. Corbett Aff. at ¶ 16; *See* Corbett Dep. at 41. However, when asked how many Wisconsin farmers were selling to plaintiff, not its subsidiary, because of the Option 2 program, Corbett could only estimate that number to be between ten and thirty-five and surmise that some of them might be Wisconsin farmers. *See* Corbett Dep. at 42.

When plaintiff deposed defendant's expert, it questioned him about the relationship between in-state and out-of-state milk processors. Previously, defendant's expert had testified on defendant's behalf during another lawsuit challenging Wisconsin volume premium regulations, *Crave v. Tracy*, 955 F.Supp. 1047 (E.D.Wis.1996), which was brought by a number of large Wisconsin dairy farmers seeking injunctive relief against enforcement of an emergency administrative rule that was a precursor to the volume premium restrictions presently in effect. The plaintiff farmers claimed that the regulations interfered with their historical practice of receiving volume premiums from out-of-state milk processors and violated the commerce clause. *See id.* at 1052–53. The court rejected the commerce clause challenge, finding in part that the plaintiffs had "not established that Wisconsin's regulatory scheme is an excessive burden on interest

commerce." *Id.* at 1064. What plaintiff Dean Foods uses to support its argument that the regulations burden interstate commerce is the parts of the expert's deposition in which he acknowledges that some milk processors believe that it is good to offer incentive volume premiums, that such premiums are allowed in other states, and that Wisconsin's regulations deny milk processors the "advantage" of offering such premiums to Wisconsin dairy farmers. *See* Deposition of Edward V. Jesse (Dkt.# 26) at 40–44.

Given the benefit of the doubt, plaintiff could establish at trial that: it buys a significant amount of milk from Wisconsin dairy farms; there are large Wisconsin dairy farms in plaintiff's "milkshed"; Wisconsin dairy farmers have been drawn to milk processors that offer incentive volume premiums; and plaintiff faces out-of-state competition that is free to offer incentive volume premiums in their milksheds. Together, these facts support findings that the volume premium regulations affect interstate commerce by (1) preventing out-of-state milk processors from obtaining whatever economic benefit is derived from paying incentive volume premiums and (2) lowering the amount of milk revenue received by Wisconsin dairy farmers who have large farms.

Although plaintiff could prove these two effects on interstate commerce, plaintiff has not produced evidence revealing that there is a significant *burden* placed on interstate commerce. True, plaintiff buys a sizable amount of milk from Wisconsin dairy farmers. But plaintiff has not shown how much of this milk is acquired because of incentive volume premiums or even produced an estimate of how much might be acquired through liberal use of incentive volume premiums. Moreover, it appears that plaintiff would have a hard time establishing that it is really harmed by the regulations. Effectively, it has placed itself in competition with its subsidiary for access to these much desired high-volume dairy farmers. Finally, plaintiff's case is hampered by the fact that it has not supplied evidence of what would appear to be the rudimentary elements of a commerce clause challenge, such as the total amount of milk produced in Wisconsin and

the portion that is available for export to the interstate market. Plaintiff notes how many of the Supreme Court's commerce clause cases have involved state laws that were protectionist of local dairy interests, without taking note that what distinguishes those cases is that the plaintiffs showed the relationship between the state's milk market and the national milk market. *Cf. West Lynn Creamery, Inc. v. Healy*, 512 U.S. 186, 188, 114 S.Ct. 2205, 129 L.Ed.2d 157 (1994) ("A Massachusetts pricing order imposes an assessment on all fluid milk sold by dealers to Massachusetts retailers. About two-thirds of that milk is produced out of State."); *H.P. Hood & Sons, Inc. v. Du Mond*, 336 U.S. 525, 526, 69 S.Ct. 657, 93 L.Ed. 865 (1949) (challenged New York State law affected exports to City of Boston, which obtained 8% of its milk from New York dairy farms); *Baldwin v. G.A.F. Seelig, Inc.* 294 U.S. 511, 519, 55 S.Ct. 497, 79 L.Ed. 1032 (1935) (New York law affected milk imports that accounted for 30% of supply within the relevant market); *Allen v. Minnesota* 867 F.Supp. 853, 862 (D.Minn.1994) (plaintiff estimated that Minnesota ban on volume premiums had a $20,000,000 impact on national market).

Plaintiff's commerce clause claim will be dismissed. Plaintiff asserts that the volume premium regulations isolate Wisconsin's milk industry from the rest of the United States, but as the analysis of its documentary evidence reveals, it has not shown that it would be able to prove this assertion at trial. Plaintiff's case falls short of showing how the Wisconsin market fits into the interstate milk market or explaining in detail how the volume premium regulations wrongfully interrupt the flow of milk between the two markets.

### D. *Supremacy Clause*

■ Plaintiff contends that the Wisconsin regulations conflict with the purposes and objectives of the federal milk marketing system and should be declared void. In a two page argument, plaintiff maintains that the ban on volume premiums will change the average local-market price paid to Wisconsin dairy farmers. According to plaintiff, because this price is a factor in the calculation of prices for federal milk marketing orders,

Wisconsin's ban on volume premiums will change milk prices nationwide. As support for this claim, plaintiff refers to the deposition of defendant's expert, who testified that the ban on volume premiums will affect the basic formula price (BFP) used in federal milk market order calculations. *See* Jesse dep. at 21–22.

Defendant responds that plaintiff has not adequately explained how the federal milk marketing system works, what its purposes are, how changes in the sales price of Wisconsin-produced milk will affect prices under the system, how much these price changes will be or how the objectives of the system will be frustrated. Defendant notes that the possibility of plaintiff's making a convincing case will be difficult because the regulations exempt transactions made in compliance with a federal milk marketing order. *See* § ATCP 100.982(2).

In addition, defendant relies on the opinion in *Crave*, 955 F.Supp. at 1047. Defendant explains that the plaintiff Wisconsin farmers raised a similar challenge to the volume premium regulations using this preemption argument and that the court rejected it. Moreover, in *Crave*, the court had before it the same evidence that plaintiff presents. An expert testified that "the restriction of volume-based premiums in Wisconsin will result in a reduction of the BFP." *Id.* at 1065. The court rejected the plaintiff farmers' argument because the plaintiffs did not show that "Wisconsin's restriction on volume premiums will conflict with *the purpose* of federal milk marketing orders." *Id.* at 1065–66 (emphasis added).

Like the plaintiff farmers in *Crave*, plaintiff Dean Foods has not given an explanation worthy of further exploration at trial of how Wisconsin's volume premium regulations will change the price of raw milk within Wisconsin to such an extent that it will affect the federal milk marketing system or how the effects on that system would be great enough that the system will not meet its purpose and objective. Defendant is entitled to summary judgment dismissing plaintiff's supremacy clause claim.

The conclusion that plaintiff has failed to provide adequate evidence to avoid summary

judgment may seem inconsistent with the finding that plaintiff has a sufficient Article III injury to make this case justiciable. This inconsistency is highlighted when one considers that the Article III analysis is intended to determine whether the party bringing the declaratory challenge has enough at stake "to make a real contest of the case." *See General Electric*, 683 F.2d at 210. However, any apparent inconsistency between the finding that plaintiff was in a position to make a contest of this case and the determination that it has failed to reach the starting line stems from the fact that the "case or controversy" inquiry measures *allegations* and the summary judgment inquiry measures *evidence*. It is true that plaintiff's allegations were structured in a way to show the existence of a controversy. But possibly because plaintiff was not confident of success on the merits and feared that enforcement actions might be taken against it later (like the landlords in *Hays*), plaintiff did not describe in depth its actual relationships with large Wisconsin dairy farms. Without this information, plaintiff had no hope of showing that the regulations unconstitutionally interfere in these relationships.

E. *Plaintiff's Motion to Withdraw Admissions*

Defendant served plaintiff with a request for admission. When plaintiff failed to file a timely response, defendant concluded that its requests were "deemed admitted" and offered them in support of its motion for summary judgment. *See* Defendant's Memorandum at 8–9. Pursuant to Fed.R.Civ.P. 36(b), plaintiff has moved for leave to withdraw these admissions, stating in an affidavit from counsel that it was agreed that plaintiff would have extra time to respond because the documents had to be circulated among several of firm's employees. Defendant's counsel has submitted an affidavit challenging what plaintiff's counsel believes were the terms of the agreement.

Plaintiff's motion to withdraw these admissions will be denied as moot. The facts revealed by these admissions are not critical to the court's findings. They concern matters relating to plaintiff's operation of the Option 2 program and were treated as disputed facts. For the purposes of the standing inquiry, the facts were viewed in plaintiff's favor. In fact, the finding that plaintiff has standing would be strengthened if the facts were deemed admitted. Furthermore, they were not sufficiently detailed to be relevant to the decision to award summary judgment in favor of defendant. Ultimately, it did not matter to plaintiff or defendant whether these requests for admissions were deemed admitted.

ORDER

IT IS ORDERED THAT:

1. Defendant Alan T. Tracy's motion to dismiss for lack of subject matter jurisdiction is DENIED;

2. Defendant's motion for summary judgment dismissing plaintiff Dean Foods Company's commerce clause claim (Count I of the complaint) is GRANTED;

3. Defendant's motion for summary judgment dismissing plaintiff's supremacy clause claim (Count II of the complaint) is GRANTED;

4. Plaintiff's motion for leave to withdraw its admissions is DENIED as moot;

5. The clerk of court is directed to enter final judgment for defendant and close the case.